No. 22,002.

VERA B. CASH, *Appellee*, v. THE KANSAS OIL REFINING COM-
PANY, *Appellant*.

SYLLABUS BY THE COURT.

MASTER AND SERVANT—*Death of Workman—Negligence Charged Not·
Proven—Demurrer to Evidence Sustained.* In an action against a re-
fining company to recover for the death of a workman, it was claimed
that the defendant was negligent in sending him into a dangerous
place without providing some person to assist him in case he was over-
come by fumes of gasoline; that he was overcome by fumes of gasoline
from the tank car, and while in this condition fell from the top of the
car to a ditch by the side of the track and inhaled water, mud and
gasoline and other waste products in the ditch, and died from suffoca-
tion. *Held,* that there was no substantial evidence, direct or circum-
stantial, fairly tending to prove what actually caused the deceased to
fall from the car, and that a demurrer to the evidence should have been
sustained.

Appeal from Montgomery district court; JOSEPH W. HOL-
DREN, judge. Opinion filed December 7, 1918. Reversed.

*Charles D. Welch,* of Coffeyville, and *Thad B. Landon,* of
Kansas City, Mo., for the appellant.

*A. R. Lamb,* of Coffeyville, and *G. H. Lamb,* of Yates Center,
for the appellee.

The opinion of the court was delivered by

PORTER, J.: Alleging in her petition that her husband, Ross
Cash, while in the employ of defendant, came to his death
through defendant's negligence, plaintiff sued and recovered
judgment for $5,775, from which defendant appeals.

The petition alleged that Ross Cash at the time of his death
was in the discharge of his duties as a pumper's helper, and
was on a tank car which was being filled with gasoline; that his
duties required him to signal to the pumper when the car was·
filled, and in order for him to ascertain this fact it was nec-
essary for him to stand on the tank car and lean over the
dome; that while he was looking down into the dome to dis-
cover whether the tank was filled, fumes and vapors arising
from the gasoline saturated and impregnated the air, so that he

Cash v. Oil Refining Co.

was overcome and fell from the car a distance of 10 or 12 feet into a ditch by the side of the track; that the fall rendered him unconscious, and while in this condition he breathed into his lungs water, oil and other waste products in the ditch, and when discovered he was dead.

Three acts of negligence are charged: *First,* defendant knew, or should have known, that vapors given off by gasoline being loaded into tank cars, were liable to overcome the deceased while performing his duties, and that defendant did not send any one to assist him in the event he should be overcome by gasoline fumes, but sent him unattended into a position of danger; *second,* that it was the duty of the pumper to watch Ross Cash while the latter was engaged in his duties, so that the pumper could render assistance to him if occasion demanded, which the pumper neglected to do; that the pumper deserted his position, and went to a place in the defendant's refinery and remained for more than five minutes, during which the accident happened which resulted in the death of plaintiff's husband; *third,* that the defendant was negligent in maintaining the open ditch along the track where the car was located, so that when Ross Cash fell from the car and into the ditch, he breathed oil and water and mud into his lungs.

Two grounds of negligence alleged in the petition were eliminated at the trial; (1) the plaintiff offered no evidence to show that the pumper neglected to watch the deceased and render him assistance if occasion required, or that the pumper deserted his post; no instructions were asked upon that issue and none were given; (2) the court instructed that plaintiff was not entitled to recover because of the presence of the ditch by the side of the track. The case was submitted solely on the issue that defendant, knowing of the dangers to the plaintiff's husband because of the fumes and vapors coming from the gasoline, and that he was liable to be overcome, negligently ordered him into a position of danger without sending any one to assist or help him in the event he should be overcome by fumes.

Ross Cash at the time of his death was an able-bodied man, 21 years of age, and had been in the employ of the defendant for several months as pumper's helper. In the afternoon of May 20, 1917, he was at work as a pumper's helper filling a car with gasoline. No one saw him fall from the car.

56—Kan.—3099

The capacity of an ordinary tank car is 80,000 gallons, and it requires about 40 minutes to fill it to the top of the shell, and two or three minutes to fill the dome. The rules of the interstate commerce commission, however, forbid the filling of a tank above the level of the top of the shell, that is, there must be no oil or gasoline in the dome. Tank cars are constructed with a running board which extends along the sides and across the ends at the height of the roof of an ordinary freight car, with a handrail of gas pipe about 3 feet above the board, for the use of trainmen passing over the car, or of persons loading, unloading or inspecting the car. The handrail is next the tank, so that a person stands or walks on the outside of the rail. When the car is to be filled, it is brought alongside of the loading rack. The defendant's loading rack consists of a platform 6 or 8 feet wide and from 12 to 15 feet above the ground. The distance between this loading rack and the running board of the tank car is between 3 and 4 feet. The oil or gasoline is carried in pipe lines up through risers to the loading rack, where there is a valve fixed about 4 feet above the floor, from which metal spouts swing to the tank car. Between the loading rack and the railway track, there is a small drain to catch water and waste. At the defendant's plant a pumper and pumper's helper did the loading of the tank cars. It was the duty of the pumper to remain at the pump house 300 or 400 feet from where the tank car stood, and to operate the pump and to watch for signals from the helper when to shut down the pump; or he could signal to inquire of the helper when to shut off the flow. The signals were given by whistling or calling. There were two methods that could be used to shut off the flow of the gasoline, either stopping the pump and then the valve, or shutting the valve first; the latter method causes pressure in the line, and the better plan, and the one usually followed, was to shut the pump down first. On the loading rack there was a board to be laid across from the rack to the running board on the tank car for use in passing from one to the other.

Roy Jarrett, an employee of the defendant, was the principal witness for the plaintiff. He described the car, the loading rack, the situation of the valves, and the methods employed in filling a car. He saw Ross Cash about fifteen minutes prior to his death, at which time Ross was standing on the running

board of the tank car leaning against the spout. He identified a photograph of a similar tank car standing on the track by the same loading rack, with a man on the running board leaning with his arms resting across the loading spout and standing about 4 feet from the dome, which he said describes the position of Ross Cash when witness first saw him. About fifteen minutes afterwards, the witness was in the receiving house 250 feet from the tank car, when he heard the pumper whistling for a signal, and saw that the car was running over; he ran to the rack to shut off the valve, first telling the pumper to shut off the pump; at that time the pumper was over at the boiler room at the side of the rack and was in position where he could have seen Ross Cash on the running board; but witness did not know how long the pumper had been there. The witness climbed upon the rack and shut off the valve. The deceased was lying face downward in the small ditch, his face buried in the mud. The body was stretched out straight. The gasoline from the tank had run over and upon the body, but could not have been running over very long—a few seconds, possibly a minute or two. His testimony is that the custom at the plant was to always whistle or call some way to draw the attention of the man who was watching the car. He did not see Ross Cash give any signal on this occasion, and he testified that when he went upon the loading rack, the board was not across from the loading rack to the tank car, but was lying over near the end of the platform. He had never seen a written rule to the effect that a helper should always put the board from the loading rack to the tank car, "but I have heard verbal rules given me, when I was working as a pumper." He was asked: "What is the rule?" His answer was: "Never to jump from the tank car to the loading rack, or loading rack to tank car, is the rule I got." When he climbed upon the platform and shut off the valve, he said he complied with the rule and laid the running board after he got there. "I laid it across from where I picked it up . . . and then I went over on the tank car." He testified that it was the duty of the pumper to see that there was suction; that the pump is at the pump house, and the pump house is connected with various tanks around about the refinery, some of them being quite a distance from the pump house, one being a quarter of a mile away, and that

there are a great number of gate valves and manifolds in the pump house which are manipulated to get the proper connections; that it was between 300 or 400 feet from the tank car to the place where Keller, the pumper, was when he was whistling for a signal from the tank car; that after the helper had put the pipe in the dome, he would go over to the loading rack and open the valve, and after he "finds that he has suction, he goes to see whether or not it is flowing into the car. While the tank car is being filled with gasoline he stands on the running board of the car, and Cash was on the west side of the dome and I saw him about fifteen minutes prior to the time that I found him dead, at which time he was standing on the running board with his arms on the spout. He was leaning on the spout. At the time I saw him he was about four feet away from the dome. It is only necessary for the loader or helper to put his head near enough the dome to see the shell of the car, to see whether or not the gasoline is coming up to the shell. With this car, I should judge he could have his head about 18 inches away from the dome, but could put his head over the dome if he wanted to. If he would put his head over the dome he would not have to be there but a second, just glance into the dome. He would probably not have to glance into the dome more than three or four times when the car was one-half full. I think he could have his head as far as 18 inches away from the dome to see whether the gasoline had reached the proper point. I think the opening in the dome is about 18 inches in diameter. He could put his head over the dome and look down if he wanted to, but that would only take long enough to take in the conditions down below."

He testified that when a tank is full and the helper has given the signal to shut the pump down, and the pumper does this, it is the helper's duty to go and close the valve on the loading rack, and shut the valve whether or not the pumper shuts off the pump; that in order to do this, the helper goes from the tank car to the loading rack on the board; that a man could get down from the car by going to the stairway (ladder) on the car instead of walking across the board; that if the spout was already in the car and the oil turned on when Ross Cash went upon the car, there would be no occasion for him to put the board across if he climbed up from the ground, but if he went

from the car to the loading rack there would be occasion for him to put the board across; that he had seen cars spouted and had spouted them himself without putting down the running board, but under "ordinary conditions the running board is put across. It is much easier to spout the car with the running board down." By "running board" the witness refers to the board used to go from the loading rack to the running board on the car. It is the duty of the helper when the car is full of gasoline up to the shell to go over to the loading rack and turn off the valve. With the board across you would have to go 6 or 8 feet to reach the valve. If, instead of going across on the board, he climbs down off the car by the ladder, and then up the stairway to the loading rack where the valves are, the witness thought it would be about 100 feet. When the pumper and the helper are working together, as a general rule, the helper does the loading and the pumper stays in some convenient place and sometimes stays in the pump house. The man who spouts the car is the one who is supposed to put the board across. He further testified: "I have heard of men loading tank cars becoming dizzy from gas fumes. I never heard of them being overcome. I have heard that they said they got dizzy."

A deputy state oil inspector, who was familiar with the loading rack in question, was called to testify to the presence of crude oil in the ditch on the issue which was not submitted to the jury. Over the objections of defendant, he testified to the conditions at other refineries; that ordinarily there are about two men to load a car, "That is, it's about the usual way; they have one at the pump house and one at the car." The pumper stops the pump, "as I have observed, when he is given the signal from the man on the car. If the pumper is not there, they have some one else there near to the pump, and when the signal is given, the pumps are stopped." He testified that if a car was running over upon a hot tank or outside shell of the car, there would ordinarily be more fumes than usual, and it was possible that a person on top of the car would, if that condition occurred, be somewhat affected from the fumes, depending upon the length of time he was there; that with the car running over and a 3-inch stream of gasoline running into it, some spray of the gasoline would come from the manhole. He further testified:

"It is the duty of the loader of a tank car of gasoline when the tank car is full up to the shell, or up to the dome, and there is no pumper in sight to take any signals, to make an effort to get the gasoline stopped from wasting. He could do this by going to the pumps or valves and closing them. These valves are on the loading rack and I don't recall any refinery that don't have them. They are up about shoulder high from the loading rack. The farthest distance he would have to go from loading the car to the valves would be fifteen feet, the shortest distance would be eight or ten feet."

His testimony is that he had made probably 5,000 tests of gasoline from tank cars at various refineries and always reached down in through the dome to get gasoline, sometimes using a quart measure and dipping it up.

"The state does not send anybody with me to attend me on top of the tank car in case I would be overcome with gasoline, and I don't take anybody with me. I never knew in all of my experience of any one becoming overcome by gasoline, loading a tank car out in the open air. That is standing on top of the car and staying on top. I have heard of men becoming overcome in a closed place, from the fumes. That is when they send a man down in a tank car to clean it out and when men are sent into a tank car to clean it out, they have an attendant on the outside of the car. . . . It might be necessary where he is finishing out a car for a man to have his head over the opening in the dome, but I don't think it would be necessary for him to put his head directly over it, but he could see in in a very short time, just an instant. Just look over this way and then come back. A loader does not have to take any particular place near the dome while the car is being loaded. If the wind were blowing in a certain direction so it was blowing the gasoline towards him, it would be possible for him to take another position, on the running board where that would not happen, and I naturally think that he would do this, and I don't see anything to prevent him from doing so."

Other testimony was offered, but none of it tended in any manner to disclose how Ross Cash came to his death, or what caused him to fall from the tank car. With their general verdict, the jury returned the following findings:

"Q. 1. Do you find that it was a rule of the defendant company in force at the time of the death of Ross Cash, for the loader of a car of gasoline to lay the foot board for a passageway between the tank car and the loading rack? A. No.

"Q. 2. Is it not a fact that the defendant by rule prohibited the loaders from jumping from the loading rack to the tank car and from the tank car to the loading rack? A. No.

"Q. 3. Does the evidence show that loaders of tank cars of gasoline, at times during the loading of cars, sit upon the open dome through which the gasoline fumes come, without injury to themselves and without being overcome by the fumes from the gasoline? A. Yes.

Cash v. Oil Refining Co.

"Q. 4. Do you find from the evidence in this case that prior to the death of Ross Cash, any loader of gasoline for defendant or for any refinery, to the knowledge of defendant, while standing in the open air as Ross Cash was at the time he was engaged in loading this car, ever became overcome by the fumes of gasoline? A. No evidence to show what defendant knew.

"Q. 5. Do you find that it is the custom of refineries to furnish an attendant for one loading a tank car of gasoline in the open air for the purpose of protecting him in case he should become overcome by gasoline fumes? A. Yes, for that and other duties.

"Q. 6. Do you find that the loader's duties at times required him to load a car with gasoline without the assistance of the pumper, the one loader himself looking after the pump? A. Yes.

"Q. 7. How far away from the opening of the dome of a tank car do you find that a loader can stand and still see into the dome and determine whether the gasoline has reached the proper height? A. From six inches to eighteen inches.

"Q. 8. Do you find from the evidence that it was the duty of a loader of a tank car of gasoline, at the time when the gasoline reached the level of the bottom of the dome, in case the pumper was not in sight to take his signal as to the condition of the car, to at once cross over to the loading rack and there turn the valve and thus shut off the flow of gasoline into the car? A. Yes.

"Q. 9. How far from the tank car do you find that the pumper was accustomed to stand to take the signal from the loader that it was time to shut down the pump? A. From 300 to 400 feet.

"Q. 10. If you find that the defendant was negligent, please state of what the defendant's negligence consisted. A. The defendant failed and neglected to provide the customary number of men at or near the tank car or loading rack in question. Also the pumper not being at a place where he could receive a signal from Ross Cash.

"Q. 11. Do you find that it was customary in well appointed and managed refineries—similar to the defendant's—to use more than one man when tank cars were being loaded with gasoline? A. Yes.

"Q. 12. Do you find that it was the duty of the pumper for the defendant to watch Ross Cash while he was upon the tank car that was being loaded with gasoline? A. Yes."

Complaint is made that the answers to questions 1, 2, 5 and 10 are none of them sustained by the evidence and are all contrary to the evidence, and that the court erred in not sustaining the motion to set them aside; and there is complaint of the admission of evidence showing the methods used in loading tank cars at other refineries. These rulings, in our opinion, need not be reviewed. A more important question arises over the demurrer to the evidence, which the court overruled.

In order to show that the negligence complained of resulted in the death of Ross Cash, it was necessary to show, either by direct or circumstantial evidence, what caused him to fall into the ditch. The evidence shows beyond question that while in an unconscious state and lying in the ditch, he inhaled mud, water and gasoline, and was thereby suffocated. Of course he did not inhale the gasoline while he was on top of the car; he may have inhaled fumes of gasoline there, but not the gasoline itself. The plaintiff claims that deceased fell from the car because he was overcome by the fumes of gasoline arising from the dome while he was standing there or looking into it.

The defendant suggests a number of theories which might account for the fall and death of deceased, some of which are fully as reasonable and as consistent with the known facts as the theory that he fell because he was overcome by fumes of gasoline. The evidence did not show that men filling cars in the open air are likely to be overcome by fumes of gasoline to such an extent that they become unconscious. On the contrary, the evidence of the witnesses is that they never knew of any one being overcome while filling a car in the open air. The plaintiff, therefore, suggests that Ross Cash might have fallen from the running board of the tank car while attempting to reach the ladder in order to get to the ground and go upon the loading rack for the purpose of shutting off the valve. The evidence shows he had neglected to place the board between the loading rack and tank car; and that his duties required him, whether or not the pumper shut down the pump, to go upon the loading rack and shut off the valve; that when the plank or board had not been laid across, there were only two ways for him to do this, either to go down to the ground from the car by the ladder, and up on the loading rack by a stairs, or jump across from the running board on the car to the platform of the loading rack. The distance was between 3 and 4 feet, and the platform of the loading rack was several inches higher than the running board on the tank car. Ross Cash may have discovered suddenly that the tank was running over, and he may have attempted to jump across this space to the higher level of the loading rack; he may have missed his footing and fallen into the ditch. The evidence is that cars were sometimes spouted without the board being placed between the rack and

Cash v. Oil Refining Co.

the tank car, and that sometimes employees jumped across from one to the other. It is suggested Ross Cash may have dozed while standing in the comfortable position with his arms across the pipe waiting the expiration of the 40 minutes it required to fill the tank, and lost his balance and fallen. These theories are referred to because they merely show the extent to which speculation and conjecture might lead from the facts and circumstances in evidence. The case cannot be distinguished in principle from a half dozen others, in which it has been held that it is not sufficient to show circumstances which would indicate that the other party might have been guilty of negligence, especially when the evidence furnished suggests with equal force that the injury might have resulted without fault on the part of the other party. (*Brown v. Railroad Co.*, 81 Kan. 701, 106 Pac. 1001; *Hart v. Railroad Co.*, 80 Kan. 699, 102 Pac. 1101; *Norman v. Railway Co.*, 101 Kan. 678, 168 Pac 830.)

In *Duncan v. Railway Co.*, 82 Kan. 230, 108 Pac. 101, it was held that, "where there is no substantial evidence, direct or circumstantial, tending to prove a material fact in issue, a finding that it exists cannot be sustained." (syl. ¶ 2.) In the opinion, Justice Benson said:

"Presumptions, as understood in the law of evidence, must have substantial probative force as distinguished from surmise. If a fact may be established by inference from the presumption of another fact, it should at least be a logical deduction and reasonably certain in the light of all other proper presumptions and of all collateral facts. The chain of presumptions ought not to be extended into the region of conjecture. (*Diel v. Mo. Pac. Ry. Co.*, 37 Mo. App. 454.) A fact is not proved by circumstances which are merely consistent with its existence. (*Carruthers v. C. R. I. & P. Rly. Co.*, 55 Kan. 600.), The lamentable death of this man may have been caused by some mischance after the uncoupling was effected. It may have been caused in the manner claimed by the plaintiff. Possibly one conjecture is as reasonable as another, but the evidence does not reveal the cause of his fall. In the absence of such evidence there can be no recovery. (*Hart v. Railroad Co.*, 80 Kan. 699.) It has been said recently by this court:

"'It is not sufficient to show circumstances which would indicate that the other party might have been guilty of negligence, especially when the evidence furnished suggests with equal force that the injury might have resulted without fault on the part of the other party.' (*Brown v. Railroad Co.*, 81 Kan. 701, syllabus.)" (p. 233.)

In *Brown v. Railroad Co.*, supra, the body of a passenger was found lying close to the railway track, the ground indicating that the body had been dragged about 30 feet. The coach in which he had been was part of a vestibule train. No one saw him fall. It was claimed that the employees of the train negligently opened the vestibule before the train arrived at the depot, thereby inviting passengers, intending to leave, to go into the vestibule; that the train was running unreasonably fast, and that the deceased was waiting in the vestibule intending to alight; that the train was stopped with unnecessary suddenness, and he was thrown out of the vestibule and under the wheels of the car; all of which furnished a quite reasonable theory to account for his death, if there had been any evidence to establish it, except the fact that he had been on the train, the vestibule was opened, and his body was found where it might have fallen. It was held that the evidence did no more than show circumstances indicating that the death of the passenger might have been caused by the specific negligence alleged against the railway company, but that this was not sufficient.

In *Byland v. Powder Co.*, 93 Kan. 288, 144 Pac. 251, the plaintiff was injured by the explosion of defendant's powder mill. There was no evidence to prove what actually caused the explosion. The same principle was applied, and it was held that, so far as the evidence disclosed, the explosion may have been caused by any one or more of the facts of negligence claimed, but this was not sufficient, because "a fact is not proved by circumstances which are merely consistent with its existence. (*Duncan v. Railway Co.*, 82 Kan. 230, 233, 108 Pac. 101.)" (p. 292.)

It follows that the demurrer to the evidence should have been sustained. The judgment is reversed and the cause remanded with directions to enter judgment for the defendant.

JOHNSTON, C. J., dissenting.