No. 31,111

ARTHUR WORLEY, as Administrator of the Estate of Wilbur Davis, Deceased, *Appellee*, v. THE KANSAS ELECTRIC POWER COMPANY, *Appellant*.

(23 P. 2d 494.)

Opinion filed July 8, 1933.

*Gilbert H. Frith,* of Emporia, and *Raymond F. Rice,* of Lawrence, for the appellant.

*Robert Stone, James A. McClure, Robert L. Webb, Beryl R. Johnson, Ralph W. Oman,* all of Topeka, and *S. S. Spencer,* of Emporia, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: This action was brought by Arthur Worley, administrator of the estate of Wilbur Davis, deceased, against the Kansas Electric Power Company to recover damages for the death of Davis, who`was killed by coming in contact with a high-tension transmission line owned and operated by the defendant. At a trial with a jury a verdict was returned finding that the defendant was negligent and liable for the death of Davis, and the damages found were fixed at $7,200. The following special findings were returned by the jury:

"1. Was the line as originally built by the three cities (Admire, Allen and Bushong) in conformity with the rules and regulations and standards required by the public service commission of the state of Kansas? A. No.

"2. After the defendant took over the line above referred to did it maintain it in accordance with the rules and regulations of the public service commission? A. No.

"3. Is it customary amongst those companies engaged in the business to attempt to insulate wires exposed to the weather, carrying 13,000 volts or more? A. No.

"4. Is it reasonable or practicable to attempt to insulate such wires? A. No.

"5. Unanswered.

"6. When was the silo upon which deceased was standing at the time of the accident built? A. About two or three days prior to day Davis met his death.

"7. Did the defendant company have any knowledge or notice that the silo upon which deceased was standing at the time of his death had been erected? A. No.

"8. Was the deceased, when tramping the ensilage in close proximity to the wires of the defendant, exercising due care for his own safety? A. Yes.

"9. If you find that the defendant was guilty of negligence, state what act or acts constituted such negligence. A. (1) No warning signs of danger. (2) Wires not sufficiently taut to prevent undue sagging, according to standards of public service commission of Kansas."

Defendant appeals and contends that negligence was not established by the evidence, and that its demurrer to plaintiff's evidence, which was overruled, should have been sustained.

It contends, also, that there was error in the rejection of evidence offered by defendant and error in the instructions given to the jury, also error in refusing to set aside special findings of the jury, and

that the findings of the jury, as made, failed to show negligence on the part of the defendant.

It appears that the power line was not originally built by the defendant. It had a central station at Emporia and a line to Americus. The towns of Bushong, Allen and Admire desired to obtain electric energy from defendant's central station, and these towns contracted with defendant to furnish energy over a transmission line to be built by themselves. The extension line, which was about nineteen miles long, was built by the three towns, and the poles were thirty feet long, set five feet in the ground, and the line consisted of three steel wires carrying a current of 13,200 volts. Before the extension was built application had been made to the public utilities commission for permission to build the line, stating the plans and specifications upon which it was to be built, and the application was approved by the commission. Shortly after it was built the extension line was acquired by the defendant and was operated by it at the time that Davis was killed. The place of the accident was near the city of Allen, on a farm of 160 acres, bounded on the east and north by public highways, and the line in question ran east and west along the north edge of the farm. A tenant named Wheat had rented the farm from the owner, and two or three days prior to the accident had constructed a silo near the power line.

The power line, it appears, was built according to plans submitted to the commission, except that it was built on the south side of the highway instead of the north side, as planned, and that the poles were planted on the adjoining farm instead of on the highway. The employee who laid out the line testified that he intended it to be in the highway. Although there is some dispute in the evidence as to how far it encroached on private property, there was testimony showing that the corner pole near the place of the accident was two feet and seven inches over the property line and on the farm, and that the cross-arm carrying the wires on the next pole extended 3.95 feet inside the property line. On the corner pole the wires were 24.7 feet from the ground, and on the next pole, which was 295 feet away from the corner pole, they were 23.3 feet from the ground. Between these poles there was a considerable sag of the wires. The silo was eighteen feet high and had been built within the property line and about two feet and two inches from the south wire. It appears that the extension line was built about six years before the accident, and

shortly after it was built by the three towns named it was acquired by the defendant, and since that time and when the accident occurred it was operated by the defendant. The place of the accident was on the north edge of the farm, the line running east and west on the north edge of the farm. Jeff Wheat had rented the farm from the owner and had grown cane thereon for ensilage. He built the silo on the north side of the farm and, as stated, close to the power line, about two or three days prior to the accident.

It does not appear that the defendant had any notice of the building or location of the silo until after the accident. The day before the accident ensilage had been placed in the silo. Wheat, the tenant, had brought Davis from town to assist him in filling the silo. On the morning of the accident Davis went up on the top of the silo, which was nearly filled, and was tramping down the loose, damp cane which had been placed in the silo the previous day, and while doing so the accident occurred. No one saw him at the moment he was electrocuted. A witness near the silo said he heard Davis gasp and looked up and saw that he was stiff and was falling on the wires. Whether he touched the wires inadvertently or purposely, or had accidentally fallen against them, or had been shocked by his proximity to the wires without actual contact, was not shown by the evidence. There was testimony to the effect that electricity is a magnet, and that there is danger in going within three feet of a wire carrying a voltage of 13,200 volts. Some witnesses said there was danger when being within ten or twelve feet, especially if the person is standing on a damp footing. The ensilage on which Davis was walking was green and, necessarily, somewhat damp. There were no burns or bruises on the hands of Davis, but there were burns on his arm about two inches above the wrist, from which it is naturally inferred that he fell on the wires instead of grasping one of them with his hand.

Defendant's principal contention is that the evidence does not establish negligence on its part. It is said that the line had been maintained for a period of six years on the place in which it was originally built, and it had never occurred to anyone that it was in a dangerous condition other than the inherent danger that exists in every power line; that it is not usual to insulate such wires in rural districts, and the jury has found that it is not customary among such companies to insulate their wires; that while the power line was on

and over the farm, it had no reason to anticipate that anyone would erect a structure so close to the highway and to the power line as to endanger the lives or safety of persons working on such a structure; that it had no notice or knowledge that the silo had been built so close to the wires and that this was specifically found by the jury. So far as warning signs of danger are concerned, defendant contends that the line itself is a warning sign, and if there had been a warning sign, even on the nearest pole, it cannot be said that Davis would have seen it or that he would have been led to stay out of proximity to the wires. Further, it is said that it is not the practice of companies operating such lines to place notices of the fact that they are carrying high voltage and are dangerous, and so, it is urged, the defendant was not bound to anticipate that persons employed on the farm would come within the danger line of the wires, and hence it was not liable for the injury that resulted in the accident, and its demurrer to the evidence should have been sustained, and further that at the end its motion for a directed judgment and for a new trial should have been sustained.

The evidence shows clearly enough that the line was over on the farm. The defendant had authority to build the line in the highway but never was granted power to build over the farm. Although defendant may not have known that the line was built outside of the highway and on private property, it was, nevertheless, a trespasser. It is true that the line had been there six years, apparently without complaint, but it was incumbent on the defendant to ascertain the location of its wires and to maintain them so as not to interfere with the use of private property over which it was built. While the tenant may have been unwise in building his silo so close to the power line, he had the right to the use of the property up to the boundary line. He testified that he did not know that the silo was so close as to be within the danger zone. He knew that the wires carried electricity, and states that he would not have built it so close if he had known of the danger. It is true that the day before the accident his nephew received a shock when he touched a wire. However, it was not Wheat that was injured, and there is no evidence that Davis, the victim, knew that the wires were carrying 13,200 volts or that proximity to them was dangerous, and, besides, it is not claimed that he was guilty of contributory negligence or even knew that the wires were other than telephone wires carrying

a current free from danger by reason of proximity to them. There were no tags or notices on the line warning him or anyone else, unacquainted with the fact, that they carried a high and deadly voltage. As stated, the jury found that the lack of warning signs was one ground of negligence which it attributed to the defendant. The defendant's claim that it was not usually done in rural districts is no excuse or release from liability, if it was necessary for the protection of the public or abutting owners or their employees, especially those not familiar with electricity and the danger of electric wires bearing a high voltage.

Where a company has built a power line which extends over private property and is carrying a killing voltage, it is its duty to exercise the highest degree of care that it shall not injure owners of the property or their employees lawfully engaged in the use of the property, and who may not have knowledge of the danger. We think it is not an unreasonable requirement that such a company should place warning signs of danger for the protection of those coming within the danger zone. Such warnings might have saved the life of Davis. Under the facts of the case and the well-recognized rule of the high degree of care required of those transmitting so dangerous a force, we cannot hold that the placing of warning signs was an unreasonable requirement nor that the failure to place them did not amount to negligence on the part of the defendant.

Another ground of negligence found by the jury was the allowance of the undue sagging of the wires. There was a span of about 290 feet between the corner pole and the one next in the line, and the evidence was that the normal sag in such a span would be about forty inches. The silo, as stated, was about fifty feet from the corner pole, and at that point the normal sag would be about fourteen inches. The silo was eighteen feet high, and the testimony is that the sagged wire was about two feet above the top of the silo. Davis was about five feet six inches tall, and his head was about two feet above the wire, and the wire about opposite Davis' hips. Under defendant's evidence the required height would be about twenty-two feet nine inches. If the wire had been taut and placed where it should have been, it would have been twenty-three feet high at the silo and about two feet above Davis' head, and the jury has determined that there was negligence of the defendant in not keeping the wires sufficiently taut to prevent undue sagging, and if it had been sufficiently taut Davis would have escaped the injury.

The question of whether there was undue sagging of the wire and that it contributed to the injury of Davis was one for the determination of the jury. In *Interstate Power Co. v. Thomas,* 51 F. 2d 964, a sagging-wire case, where the wire was suspended over a highway and in which it was held to be the duty of the company to exercise the highest degree of care, in speaking of the care the court quoted with approval the rule that—

" 'Those engaged in transmitting such a dangerous force as electricity, which gives no warning of its presence and is not apparent to the senses, are required to exercise a degree of care in constructing and maintaining the wires over which it is transmitted commensurate with the danger to be apprehended from contact with such wires or the escape of electricity therefrom; but they are not insurers against accidents or injuries.' (*Bunten v. Eastern Minn. Power Co.,* 178 Minn. 604.)" (p. 967.)

And, also, quoting from Joyce on Electric Law, section 445:

" 'A company maintaining electric wires over which a high voltage of electricity is conveyed, rendering them highly dangerous to others, is under the duty of using the necessary care and prudence at places where others may have a right to go, either for work, business, or pleasure, to prevent injury.' " (p. 967.)

In *Logan v. Electric Co.,* 99 Kan. 381, 161 Pac. 659, where there was suspended a low wire over a highway, by which a person in attempting to move a house under the wire was killed by contact with a high-tension wire, it was held that the company should have anticipated the moving of buildings along the highway and have elevated the high-voltage wire to an extent that would not interfere with the lawful use of the highway. In that case it was further held that the impracticability of insulating the wires carrying more than 6,000 volts of electricity, and the expense of making it safe, would not excuse the failure of the defendant nor preclude the plaintiff from recovering damages for the injury and loss. (See, also, *Winegarner v. Edison,* 83 Kan. 67, 109 Pac. 778; *Wade v. Electric Co.,* 94 Kan. 462, 147 Pac. 63; *Walmsley v. Telephone Association,* 102 Kan. 139, 169 Pac. 197.)

In the Walmsley case a person was riding on a wagon along a road and had a loaded gun and other articles thereon. A low telephone wire caught the load, upset the wagon and discharged the gun, with the result that the bullet struck the driver. In considering the matter of probable cause and what the defendant should have reasonably anticipated, it was said:

"Damage of some sort was natural and probable, almost inevitable. That

somebody would be shot through defendant's negligence would not have been anticipated. But the law does not say that if the particular injury arising from the negligence cannot be anticipated a recovery cannot be had. That some damage, some injury, would probably arise from the existing negligence, and that it could reasonably have been expected, is all that the law requires to justify a recovery." (p. 143.)

An examination of the facts and circumstances disclosed in the record leads us to the opinion that the grounds of negligence found by the jury were sufficiently sustained by the evidence, and that there was no error in denying defendant's demurrer to plaintiff's evidence.

There is a complaint of the exclusion of a document of the public utilities commission, which, it is said, tended to show that the line was built in conformity with the requirements of the commission. The document might have been received in evidence on general principles, but the matter of what was required was so fully brought out, as well as the manner of construction, that even if it should be classed as error it cannot be considered as material.

Some of the instructions of the court are criticised, but an examination of the same discloses that there is nothing in them of which the defendant has good reason to complain.

The conclusion of the court is that the judgment should be, and it is, affirmed.

DAWSON, J. (dissenting): Defendant's power wires were strung alongside a country road—it being undetermined whether they were actually located in the roadway or encroaching a few feet into the adjoining field. There they remained for six years without harming or being capable of harming anyone. Then the tenant of the land built this silo under the power wires when he had a whole 160-acre farm on which to build it! Within three days thereafter this fatal accident happened to the tenant's hired man. It occurs to me that this case falls clearly within the rule of the textbooks, and of our own precedents in negligence cases, which is to this effect:

While liability attaches to all consequences of negligence which are natural and probable and which are reasonably to be anticipated, liability does not extend to any consequences so extraordinary and unlikely to happen that they could not reasonably have been foreseen. It seems clear to me that this case falls within this rule and the authorities cited in its support in *Beldon v. Hooper*, 115 Kan.

678, 224 Pac. 34, syl. ¶ 1. (See, also, Harper's Law of Torts, § 128; 1 Cooley on Torts, 3d ed., 128.)

I therefore dissent.

BURCH and THIELE, JJ., concur in the dissent.