No. 34,749

Julia Jackson, *Appellee* and *Cross-appellant,* v. The Kansas Gas & Electric Company, George W. Ramsey et al., *Appellants.*

(102 P. 2d 1038)

Opinion filed June 8, 1940.

*C. H. Brooks, Howard T. Fleeson, Carl G. Tebbe, Wayne Coulson, Paul R. Kitch,* all of Wichita, *J. B. McKay,* of El Dorado, *H. L. McCune, Stanley Garrity* and *R. S. Eastin,* all of Kansas City, Mo., for the appellants.

*K. M. Geddes,* of El Dorado, *Robert C. Foulston, George Siefkin, Sidney L. Foulston, Lester·L. Morris, George B. Powers, Carl T. Smith, C. H. Morris* and *John F. Eberhardt,* all of Wichita, for the appellee.

The opinion of the court was delivered by

Thiele, J.: This was an action to recover damages for death by wrongful act, the individual defendants being owners and operators

of an oil and gas lease on certain described real estate, and the corporate defendant being a public utility which furnished electric power for use thereon.

At the conclusion of plaintiff's evidence, the several individual defendants and the corporate defendant interposed demurrers, which were overruled. No evidence was offered by any defendant, but the individual defendants and the corporate defendant each moved the court for a directed verdict. These motions were overruled. The jury was unable to agree on a verdict and was discharged. Thereafter the defendants perfected their several appeals, specifying as error the adverse rulings on the demurrers and the motions for a directed verdict. The plaintiff filed a cross-appeal, but presents no argument in connection therewith and it will not be noticed further.

Plaintiff's decedent was driving a truck loaded with a vacuum pump which he was to deliver at the lease. In operating the truck, a part of the pump came in contact with an electric power line, and, as more fully set out later, the driver was killed. No person saw the accident, and, in an attempt to show what happened, the evidence covered considerable ground. For clarity we have grouped portions of the evidence, and our statement does not follow the order in which it was offered. It also includes reference to matters not important, but helpful, in explanation.

To the east of the leasehold where the accident occurred is a public highway. At some considerable distance north from the south boundary of the leasehold, a road leads from the highway westward past a house occupied by one Fred Lee, the lease foreman of the individual defendants. There is a branch roadway that leads from the foreman's house to buildings to the south. At a distance of about 150 yards south and to the east of this roadway is well No. 4, at which the accident occurred, the ground between being grass land. At a short distance south of the well is an electric power line owned by the corporate defendant. It extends from the public highway on the east a considerable distance to the west to a transformer bank. From that bank electric power lines owned by the individual defendants parallel the company's line eastward to a point south and slightly west of the well and then turn northwest to a pole about ninety feet west of the well. From that pole the lines extend about ninety feet to the pump house which sits to the north of the well. There were three wires from the pole to the

pump house and they carried 440-volt current. The pump house was a corrugated iron building. Near the eaves on the west side were bolts or fasteners to which were attached wires leading out to insulators to which the electric light wires from the pole were fastened. From a point near the insulators wires were looped down and went into a metal fixture through which they were taken inside the pump house. The length of these loops was five or six feet. How far out from the building they extended or how high above the ground the fixture was located is not shown in the evidence as abstracted. The three wires from the pole to the pump house were almost the same height above the ground. At the lowest point the lines were eight feet high. On December 26, 1936, plaintiff's decedent, Harold Jackson, drove a truck loaded with a vacuum pump to be delivered at the lease. It was a drizzly day and it was or had been raining and the ground was wet. Jackson, who so far as the evidence showed, had never been at the lease before, arrived and stopped at the foreman's house about noon. The foreman told him where the pump went, showed him where the well was, told him to go down there and that he, the foreman, would come down shortly and help him unload the pump. Jackson went down the road. Later the foreman went down to the well, did not see Jackson when he first got there, discovered the truck was charged with electricity, went around it and saw Jackson lying with his head against the rear left wheel of the truck. Jackson was either dead or died shortly thereafter. The truck Jackson was driving was a 1935 Ford ton-and-a-half truck, and there were chains on the rear wheels. The cab of the truck was approximately six and one-half feet high. The vacuum pump was loaded on the rear of the truck. The pump had a plunger or piston rod which projected upward from the pump so that the projection was higher than the cab. Near the top of the plunger was a collar, or nut. The pump weighed about 1,200 pounds and the load was an ordinary and usual one. Details as to the pump will be mentioned later. The road leading south from the foreman's house was not a graded road; it could be seen that it had been traveled. About two-thirds of the way south from the foreman's house to well No. 4 a branch of the road turned off east to well No. 4. If this branch road were followed, the user would pass under the electric power line about midway between the pole and the powerhouse, the wires there being 15 to 18 feet above the roadway. No one saw Jackson after the foreman directed him

to go to well No. 4 until the foreman went to the well and found him. The tracks made by Jackson's truck showed that before reaching the branch road Jackson drove to the east and turned south so that he passed within about three feet of the west side of the pump house and then turned west and moved forward and backward twice so as to place the rear of the truck at a platform or runway between well No. 4 and the pump house north of it, and in a position for unloading the pump. As the truck came past the pump house, the north wire leading from the pole to the pump house caught on the piston rod of the vacuum pump and was held there by the nut at the top of the piston. Without knowing the order of events, the situation disclosed later was that as the truck moved south, the north engaged wire tightened and pulled the enginehouse to the west and six or eight inches off its foundation, the fixtures on the roof broke and the engaged wire rubbed on the two remaining wires so that the insulation was removed and contact made for the passage of the current. After Jackson had placed his truck in position to unload the pump, he got out of the cab, and while on the ground and near the rear left wheel he came in contact with the truck, the circuit of electricity was completed and he was killed.

Referring to the pump, there was evidence that with the piston extended, the pump stood five feet high. The piston rod had a twelve-inch stroke. The evidence showed the piston rod was extended up, but whether extended its full length was not shown. It was not shown how high the bed of the truck was nor how high the top of the piston rod was above the ground as the pump was loaded on the truck, although the witness, Lee, said he didn't believe the top of the rod was over five inches higher than the cab of the truck. A photograph was introduced showing the truck, pump, pump house, etc., immediately after the accident. Bearing in mind the testimony showed the cab of the truck to be six and one-half feet high, from the photograph a jury might readily infer the top of the piston rod extended a considerable distance higher.

With reference to the wires on the leasehold, the foreman stated they were installed before he commenced working there seventeen years before. That from time to time when repairs or replacements were necessary, he had had the work done by the defendant company and what was done was done at his request and paid for by his employers, and that the three wires from the pole to the pump house had been reinstalled within a year previous to the accident.

Although we have set out the evidence at some length, in determining its sufficiency as against appellants' attacks, we follow the rule that it is to be considered in the light most favorable to the plaintiff, resolving all inferences in her favor, disregarding unfavorable parts and any differences between direct and cross-examination, and if there is any evidence which sustains her case, the demurrer must be overruled. (See *Jones v. McCullough,* 148 Kan. 561, 83 P. 2d 669; *Trezise v. State Highway Comm.,* 150 Kan. 845, 96 P. 2d 669, and cases cited.)

All of the defendants contend that by departing from the road Jackson became a mere licensee to whom they owed no duty except not to willfully injure him; that they breached no duty they owed him; that he was guilty of contributory negligence, that he could not recover had he survived, and his widow may not now recover. Before taking up any discussion of those contentions, we note the contention of the corporate defendant that even though the individual defendants might be liable, it is not; that it acted as an independent contractor, and if the electric lines were negligently maintained it was not responsible. The individual defendants contend that if they are liable so is the corporate defendant, as it furnished electric current through lines which it had erected and the condition of which it was aware. We shall take up these last contentions first. The appellee makes no distinction between the liability of the several defendants, contending that while the individual defendants owned the lines, they were installed, repaired and replaced by the corporate defendant.

The evidence has been detailed. There was no evidence that the corporate defendant had anything to do with the original installation, nor with what repairs were to be made, or that it had any duty of maintenance whatever. On occasion it was called to do particular pieces of work for which it was paid. So far as the evidence shows, its position with reference to repairs and maintenance was no different than would have been the case had an electrician from the nearest city done the work, unless it would be because it furnished electric current. The individual defendants contend that if the installation was defective, the corporate defendant, having made the repairs on the particular wires in question, had notice of any defect and if it furnished electricity through such wires, its liability would follow.

Our attention is directed to *Hoffman v. Power Co.*, 91 Kan. 450, 138 Pac. 632, where the company was under contract not only to furnish electricity, but to supply, maintain and trim arc lights for the United States government on the reservation at Leavenworth. Certain equipment became defective, and a boy coming in contact with a certain piece of apparatus was killed. After a review of authorities dealing with the liability of a company furnishing electric current, it was said:

"The question of the defendant's liability is a new one in this state and must be decided in accordance with established principles. Two of these principles are that one shall so use his own as not to injure another, and that the law demands only what is reasonable under the circumstances to avert such injury. The furnishing of electric current to distant places is a necessity of modern civic and industrial life, but it is in strict line with the dictates alike of law, morals and humanitarianism that one who generates and sells this dangerous agency should use proper care to avoid resulting harm. When such power is simply furnished to a responsible party for use in a system of poles, wires and appliances owned and controlled by such party and in proper condition to receive the current safely, the furnishing party is not required to maintain inspection or to see at its peril that such equipment is kept safe, but so long as not chargeable with knowledge of defect therein it may justly and reasonably assume that such safety will be maintained; justly and reasonably, because the using company is presumed to act in accordance with prudence and safety until the contrary appears. The fact that in furnishing such power for arc lighting the seller undertakes to supply and maintain the necessary lamps and carbons does not change the rule, for such party has the same right as before to assume that the purchaser will act with due care. In order, therefore, to hold the seller liable it must appear that it continued to furnish and turn on the dangerous current after knowing that the purchaser had permitted the equipment to become defective. From the time of acquiring such knowledge the seller's contract duty cannot be required save on condition that such defect be remedied, for otherwise it must thenceforward furnish a dangerous force knowing that life and limb might be imperiled by reason of such defect, which neither a contract nor the law nor the common instincts of humanity could require of any one." (p. 461.)

In *Snook v. City of Winfield*, 144 Kan. 375, 61 P. 2d 101, the city had actual notice of a defective condition at a farmhouse which it served with electricity. City employees made an inadequate investigation and failed to remedy defects. Later a young woman was killed by coming in contact with escaping current. The Hoffman case, *supra*, was distinguished on the facts, and it was held:

"One who sells electricity to be used on lines or appliances which he knows to be defective and dangerous is not relieved from liability because of the fact that the lines or appliances are owned by someone else." (Syl. ¶ 4.)

Other cases to like effect are cited. It would appear that although the corporate defendant was an independent contractor, insofar as repairs were concerned, that would not relieve it from liability for furnishing electricity if it knew the lines and appliances were defectively and dangerously installed. We note *Engler v. Aldridge,* 147 Kan. 43, 75 P. 2d 290, cited by the corporate defendant. That case may be distinguished from the case at bar. The independent contractor there had completed his work, and had turned it over to the state, and the rule of immunity in such circumstances was applied. It cannot apply here. Whether the evidence disclosed that to be the case will be discussed later.

The defendants direct our attention to cases such as *Jones v. Swatszel,* 145 Kan. 99, 64 P. 2d 555, holding that an invitee who goes beyond the scope of his invitation loses for the time being his status as an invitee, and that the defendant, under such circumstances, owes him no duty except not to willfully injure him, and they contend the evidence discloses that Jackson, by leaving the road and going as he did to the well, lost his status as an invitee and became a mere licensee. The difficulty is not with the rule of law, but in its application. To begin with, there is no evidence that leads to any conclusion the road which led south from the warehouse had a definite, distinguishable branch leading off toward well No. 4. The foreman did not tell Jackson to follow the road. He told Jackson where well No. 4 was and to take the pump there. So far as the evidence discloses, the character of the ground was the same whether the road be followed or whether the driver go straight across. And that this was so is evident from the fact that he crossed to the well without difficulty. It is obvious from the photograph, it was safe to drive any place to the west and north of well No. 4, and there is no evidence this was not true. If there was any danger to be encountered in leaving whatever branch road there may have been, it was not obvious, nor was there any evidence that Jackson knew of it or realized there was any risk. The foreman knew that Jackson had not been on the land before, but he did not caution him about any necessity of staying on the road. The argument must be that the path followed by Jackson was dangerous because it brought him to a place where the electric light wires were lower than would have been the case had he followed the so-called road. The question would then be how obvious was the danger. It must be assumed that Jackson would not do something that would cause him personal

harm. The day was rainy, the ground was muddy and he was operating a truck carrying a considerable load. The wires which caused the danger would not be as readily seen as though the weather were clear and the ground dry. Without pursuing the matter further, we think the evidence does not disclose a situation where it must be said, as a matter of law, that Jackson lost his status as an invitee on the premises.

Does the evidence, and the inferences which may rightfully be drawn from it, disclose negligence on the part of the defendants? Our own cases recognize that electricity is of dangerous nature, and that a high degree of care is required in furnishing, supplying and using it (for example, see the Hoffman and Snook cases referred to above, and the cases cited therein). The rule generally is stated in 18 Am. Jur. (Electricity, § 48), p. 443, where it is said:

"The degree of care required to be used in the production, distribution, and use of electricity, a force concerning which about the only thing certainly known is its highly dangerous character, is stated in various terms which, perhaps, convey merely one idea. To declare that the utmost care must be used to prevent injury sounds different in statement than to say that ordinary care must be used in view of all the circumstances; but when analyzed, the meaning is not far different, for the ordinary care required under the circumstances is relatively a high degree of care when put into practice.

"While the measure of duty resting upon electric companies in order to exonerate them from liability for negligence is expressed by the courts in forms varying from reasonable or ordinary care and diligence to a close approximation to the view that they are insurers, yet the generally accepted rule in such cases, as in determining liability for negligent injuries generally, is that such companies are bound to use reasonable care in the construction and maintenance of their lines and apparatus—that is, such care as a reasonable man would use under the circumstances—and will be responsible for any conduct falling short of this standard. The degree of care which will satisfy this requirement varies, of course, with the danger which will be incurred by negligence and must be commensurate with the danger involved. According to numerous decisions, where the wires maintained by a company are designed to carry a strong and powerful current of electricity, so that persons coming in contact with them are certain to be seriously injured, if not killed, the law imposes upon the company the duty of exercising the utmost care and prudence consistent with the practical operation of its plant to prevent such injury, especially where high-tension wires are suspended over the streets of populous cities or towns, for here the danger is great, and the care exercised must be commensurate with it. The law is complied with when the company provides such a protection as will safely guard against any contingency that is reasonably to be anticipated. The company is not legally bound to safeguard against occurrences that cannot be reasonably expected or contemplated. Also,

the user of electricity must provide against all probable contingencies and every possibility of injury to others that can be readily foreseen or anticipated."

Another statement may be found in 20 C. J. (Electricity, § 36), page 341. In the same authority it is said, on page 345, that it makes no difference that the injury occurs on private property if the injured person had a right to be there. In *Canestro v. Joplin-Pittsburg Rld. Co.*, 135 Kan. 337, 340, 10 P. 2d 902, it was said:

"The rule is well established by this court that negligence may be proven by circumstantial evidence, but the circumstances must be of such a nature and so related to each other that it is the only conclusion that can reasonably be drawn from them. A fact is not proven by circumstances which are merely consistent with its existence. (*Byland v. Powder Co.*, 93 Kan. 288, 144 Pac. 251; *Cash v. Oil Refining Co.*, 103 Kan. 880, 176 Pac. 980; *Lukens v. Kellogg*, 127 Kan. 568, 274 Pac. 225.)" (p. 340.)

The positive evidence discloses that the truck driven by Jackson carried an ordinary load, and that the top of the piston on the pump being transported caught on an electric power wire carrying a 440-volt current. The height of the piston would not be of primary importance if the wires were suspended an ample height above the ground. There would have been no interference unless the wires were installed without sufficient clearance, or, if sufficiently clear, unless one or more of them had sagged, or unless the method of construction was such there was likelihood one passing close to the pump house would catch one of the wires as it looped down from the insulator to the fixture leading into the pump house. It is clear here that one of the three situations had to exist, and it may not be said that had a jury found one of them to be the fact it would be merely consistent with its existence. The positive evidence discloses that the top of the piston caught the wire in some manner. What might the jury rightfully infer? Bearing in mind the duty of the individual defendants to have their electric lines carrying a heavy charge of electric current so installed that one lawfully on the premises would not come in contact with them, the jury, under the evidence, might have found the original installation was too low, and that there should have been a pole at the pump house. In such case, the corporate defendant would likewise be liable, for it knew the method of construction and continued to furnish current. The jury may have concluded that as Jackson drove his truck and swerved the front end out preparatory to backing, the back end swung around so that the piston caught one of the loops, in which

event the question would again be whether due care was exercised in installation. Or the jury may have concluded that one of the wires was sagged. In such a case liability might depend on knowledge of the sagging. It is true the lease foreman testified the wires were each eight feet high, and that it may be inferred from his and other testimony that the top of the piston was less than seven feet above the ground, but all that could not be fully true, otherwise the truck and its load would have passed under the wires safely, unless, as indicated, one of the loops caught the piston. We think it may rightfully be inferred the wires were not properly constructed and maintained.

We note an argument made by appellants that the construction at the particular well was the same as at other wells in the whole field. The witness did testify he had observed oil wells constructed similar to the one in question, but the abstract fails to disclose he was asked anything about the installation of electric wires. The inferences are to be resolved in favor of the appellee, not the appellants. Certainly in considering sufficiency of evidence as against a demurrer, the court will not infer a defense in favor of the demurrants.

It is also contended that Jackson was guilty of contributory negligence. Without going into detail, it may be said the argument is predicated on testimony and inferences favorable to the appellants. It is said Jackson should have seen the wires. When it is remembered that it was rainy, the ground was slippery, and that he was maneuvering his truck, and when also the evidence showed that the foreman himself did not notice the wires were displaced until after he saw Jackson's body and made some examination, it can hardly be said the question was not for the jury.

In what has been said, we have avoided discussion of defensive matters. Whether the appellee can ever convince a jury she is entitled to recover is one thing; whether her evidence was good against a demurrer is another. The questions presented by the motions for directed verdicts in favor of the appellants raise the same questions as did their demurrers.

We have concluded the trial court did not err in overruling the demurrers and in denying the motions for directed verdicts, and its judgments thereon are affirmed.