No. 54,209

Max L. Wilson, *Appellee,* v. The Kansas Power and Light Company and Bob Wilson, *Appellants.*

(657 P.2d 546)

Opinion filed January 14, 1983.

*Frederick K. Starrett,* of Fisher, Ochs and Heck, P.A., of Topeka, argued the cause, and *Robert D. Ochs,* of the same firm, was with him on the brief for appellant The Kansas Power and Light Company.

*John W. Mize,* of Clark, Mize & Linville, Chartered, of Salina, argued the cause and was on the brief for appellant Bob Wilson.

*Dennis M. Clyde,* of Gates & Clyde, of Overland Park, argued the cause, and *Lawrence C. Gates,* of the same firm, was with him on the brief for appellee.

The opinion of the court was delivered by

McFARLAND, J.: This is an action brought by Max L. Wilson seeking damages for personal injuries received when an aluminum irrigation pipe came in contact with an electrical distribution line owned by defendant Kansas Power and Light Company. The jury returned a verdict fixing plaintiff's damages at $2,705,000. Fault was assessed 60% to defendant power company, 20% to defendant Bob Wilson, and 20% to plaintiff. Defendants appeal from said judgment, asserting numerous claims of error. Plaintiff cross-appeals, contending the trial court erred in not submitting the damage element of loss of future earnings to the jury.

A major issue is raised relative to whether the trial court erred in overruling defendant KPL's motion for a directed verdict. KPL contends the evidence failed to show, as a matter of law, any breach of a duty owed to plaintiff.

The rules relative to determination of directed verdict motions

are well established and apply equally to appellate courts. In reviewing a motion for a directed verdict, the court must consider the evidence in a light most favorable to the opposing party. The court does not weigh evidence but must accept as true all the facts which the evidence tends to prove and draw against the party making the motion all reasonable inferences most favorable to the party opposing the motion. If the evidence is of such character that reasonable men in an impartial exercise of their judgment may reach different conclusions, then the case should be submitted to the jury. *Guarantee Abstract & Title Co. v. Interstate Fire & Cas. Co.,* 228 Kan. 532, 618 P.2d 1195 (1980); *Traylor v. Wachter,* 227 Kan. 221, 607 P.2d 1094 (1980); and *White v. New Hampshire Ins. Co.,* 227 Kan. 293, 607 P.2d 43 (1980).

The relevant facts are basically not in dispute. It is necessary, however, to set forth in considerable detail the background facts as well as the events of July 16, 1977.

Max and Bob Wilson are two of the seven Wilson brothers and sisters who each own one-seventh of Wilson Farms, Inc., a family farming corporation. Said corporation owns land valued at approximately $1,000,000. Brothers Max, Jack, Bob and Steve were partners in Wilson Farm Account which owned all the Wilson family farm equipment and leased the Wilson Farm property. An additional partnership among the four, known as Wilson Brothers Livestock, operated the livestock end of the business. The family also owned a grain elevator, a seed company, and part of a small farm equipment manufacturing firm. These three auxiliary businesses were quite small operations. Max had assumed overall management of the family businesses. Bob was particularly involved with the livestock partnership.

The scene of the accident was the Murphy Farm, an 80 acre cultivated tract owned for many years by Wilson Farms, Inc., and leased to the partnership. Running north and south along the west boundary line of the property are high voltage electrical transmission and distribution lines owned by defendant KPL. In 1971 Max decided the Murphy farm should be irrigated. A well was drilled and Max executed a contract with KPL to provide power to the irrigation pump from the nearby distribution line. The pump is 60 feet from the southwest corner of the property. The irrigation method employed is flood irrigation with 30-foot sections of aluminum pipe being laid down the length of the western

boundary to irrigate the west one-half of the field. Then the pipe is moved to the eastern boundary to water the other half. When in use the pipe is about eight inches high. The Murphy farm irrigation project had been personally supervised by Max since its inception. When the 30-foot pipe sections are not in use, they are stacked in the southwestern corner of the tract. Said pipe pile is about two feet high and is usually located on the boundary near KPL poles.

On the afternoon of July 16, 1977, Bob Wilson stopped by the family elevator and was asked by Max to accompany him to the Murphy Farm and assist him in laying irrigation pipe. It was a hot summer day. The two brothers and a sixteen-year-old employee named John Greenough went to the farm and started moving the pipe in place on the west boundary line, starting at the pump and working northward. Max was in charge of the operation. Murphy Farm was planted in corn which was about six feet high on the day in question. Adjoining the west boundary line was a neighbor's alfalfa field but there is no fence between the properties. There are no trees, buildings, or other visual obstructions along the boundary line. Both brothers knew of the danger inherent in coming into contact with the high voltage electrical lines along the Murphy Farm west boundary line.

At about 5:30 in the afternoon the men had all but the last section or two in place. John Greenough stopped to rest and observed the following events from some distance. Bob was carrying a pipe when it was noticed the gate inside the pipe was loose. Bob tilted the pipe to let the gate fall out, but nothing happened. Bob tried to raise the elevated end of the pipe higher, but the end on the ground started to slide. Bob then said, "Max, if you want me to raise this pipe any more, you're going to have to support the end." Max placed his foot on the end of pipe. The two men were then facing each other. With his end of the pipe in the air, Bob started walking toward Max. Each step elevated the pipe end higher. Bob was walking away from the raised end of the pipe and therefore could not see that end. Max was facing in the direction of the raised end. While being elevated, the end of the pipe either came in direct contact with a distribution line 23 feet, 6 inches above the ground or came so close thereto that electricity arced over to the pipe.

Both men were knocked to the ground by the current. Bob was

momentarily stunned, but then went to Max's aid. Max was unconscious and turning blue. It was apparent he had suffered cardiac arrest. While Bob administered CPR, the sixteen-year-old employee went for help. As a result of the electrical shock, Max lost two toes on one foot. Additionally, he lost considerable memory of earlier events in his life and has no recall of the accident itself. Max also has some short-term memory loss and must make written notes to himself in order to function adequately. Max was thirty-four years old at the time of the accident and was considered to be above average in intelligence and Bob was of, at least, average intelligence.

Bob testified the unfortunate accident could have been avoided if he and Max had just walked further out into the alfalfa field before raising the pipe. There are obviously a number of things the brothers could have done to avoid the pipe coming into contact with the electrical line. On this issue, however, we are concerned only with whether KPL acted negligently.

We must describe the lines and their location in more detail. The lines run along the length of the west boundary of Murphy Farm. Immediately south of the tract is the Smoky Hill River and just across the river is a KPL power plant. Two miles north of the farm lies the city of Abilene. One-quarter mile to the west is Highway K-15. The lines carry electricity from the power plant to Abilene and have been continuously so located since at least 1928.

The poles carry multiple strands of wire. All wires are transmission lines except for the lowest wire which is a distribution line. A transmission line carries 15 kilovolts or above. A distribution line carries below 15 kilovolts. The distribution line was the one which was contacted by the pipe and it carries 13.8 kilovolts. At the presumed point of contact the line was 23 feet, 6 inches, above the ground. The lowest point of said line is 23 feet, 2 inches, above the ground. The National Electrical Safety Code, upon which both experts relied, sets the appropriate line height at 20 feet, absent special hazardous circumstances. The lines were fully operational at the time and there is no contention the equipment utilized thereon was in any way defective.

As we have previously noted, there really is no dispute as to: (1) the background facts; (2) how the unfortunate accident itself happened; or (3) the physical layout of the power lines. Further

there is no real controversy as to the applicable law relative to the power company's duty herein. It is the application of that law to the facts on which the parties sharply divide.

*Henderson v. Kansas Power & Light Co.,* 184 Kan. 691, 339 P.2d 702 (1959), on which all parties rely, states the general rules as follows:

"[A]s a general rule electric companies which erect and maintain such lines are under a duty to exercise the highest degree of care to protect the public from danger. (*Railway Co. v. Gilbert,* 70 Kan. 261, 78 Pac. 807 [1904]; *Wade v. Electric Co.,* 94 Kan. 462, 465, 147 Pac. 63 [1915]; *Snyder v. Light Co.,* 98 Kan. 157, 160, 165, 157 Pac. 442 [1916]; *Worley v. Kansas Electric Power Co.,* 138 Kan. 69, 23 P.2d 494 [1933]; *Jackson v. Kansas Gas & Electric Co.,* 152 Kan. 90, 97, 102 P.2d 1038 [1940].)

"In *Murphy v. Central Kansas Electric Cooperative Ass'n.,* 178 Kan. 210, 284 P.2d 591 [1955], it is stated that the degree of care required of distributors of electricity is the degree which would be used by prudent men engaged in the industry, under like conditions and commensurate with the dangers involved and the practical operation of the plant, to guard against contingencies which can be reasonably foreseen and anticipated, but such distributors are not liable for occurrences which cannot be reasonably anticipated and are not insurers against accidents and injuries." 184 Kan. at 695-96.

*Henderson* then cites certain statements from 18 Am. Jur., Electricity § 48, at pp. 443-46. These statements are included, virtually unchanged, in 26 Am. Jur. 2d, Electricity, Gas, and Steam § 42, pp. 248-50, which section discusses the relevant standard or degree of care as follows:

"The degree of care required to be used in the production, distribution, and use of electricity is stated in various terms which, perhaps, convey merely one idea. To declare that the utmost care must be used to prevent injury sounds different in statement than to say that ordinary care must be used in view of all the circumstances; but when analyzed, the meaning is not far different, for the ordinary care required under the circumstances is, in its practical application and in view of the highly dangerous character of electricity, a relatively high degree of care.

"While the measure of duty resting upon electric or telephone companies and others transmitting or using electricity in order to exonerate them from liability for negligence is expressed by the courts in forms varying from reasonable or ordinary care and diligence to a close approximation to the view that they are insurers, or that they owe a high, or the highest or utmost, degree of care, yet the generally accepted rule in such cases, as in determining liability for negligent injuries generally, is that such companies or persons are bound to use reasonable care in the construction and maintenance of their lines and apparatus—that *is,* such care as a reasonable man would use under the circumstances—and will be responsible for any conduct falling short of this standard. The degree of care which will satisfy this requirement varies, of course, with the danger which will be incurred by negligence and must be commensurate with the danger involved.

"The particular voltage of the current carried by a transmission line may have some bearing on the degree of care required of the owner of the line. According to numerous decisions, where the wires maintained by a company are designed to carry a strong and powerful current of electricity, so that persons coming in contact with them are certain to be seriously injured, if not killed, the law imposes upon the company the duty of exercising the utmost or highest degree of care and prudence consistent with the practical operation of its plant or business to prevent such injury, especially where high-tension wires are suspended over the streets of populous cities or towns, for here the danger is great, and the care exercised must be commensurate with it."

29 C.J.S., Electricity § 39, pp. 1064-66, states the general rules relative to the applicable standard of care as follows:

"[A]n electric company is not liable as an insurer, and reasonable care does not require such precautions as will absolutely prevent injury or render accidents impossible. The degree of care requisite is such as reasonably safeguards against contacts which according to human knowledge and experience are likely to occur; the duty is reasonably to guard against probabilities, not possibilities, and not to protect against any and all possible eventualities. In other words, the care required may properly be stated to be the highest degree of care which skill and foresight can obtain, consistent with the practical conduct of business under the known methods and present state of the particular art."

In discussing generally the theory of the law applicable to a power company's liability for injuries from electrical current, 26 Am. Jur. 2d, Electricity, Gas, and Steam § 39, pp. 245-47 states:

"In accordance with the general doctrines as to the duties and liabilities of persons making use of instrumentalities apt to injure others, it has been held that where one accumulates and gets possession of a quantity of electricity and attempts to use it, he must take care of it and see that it does not do damage to persons or property. It was early held in England that the famous rule in the case of Rylands v. Fletcher [[1868] L.R. 3 H.L. 330], that one who has brought something on his own property (which was not naturally there), harmless to others so long as it is confined to his own property, but which he knows will be mischievous if it gets on his neighbor's, should be obliged to make good the damage which ensues if he does not succeed in confining it to his own property, was applicable to one having electricity under his control, and that if it escaped and injured his neighbor, he was liable therefor, irrespective of negligence. However, this rule does not generally obtain in this country now. According to a number of American authorities, while those engaged in generating and distri- buting electricity may be held to a high degree of care for the protection of those liable to come in contact with this dangerous and subtle force, nevertheless the liability of electric companies, telephone companies, and others transmitting or using electricity for damage or injury, is governed, not by the principles of insurance of safety, or of contracts, but, as in the case of unintended damage or injury generally, by the simple rules of the law of negligence. Such companies or persons are not commonly regarded as insurers against injury. The obligation of

electric companies to exercise proper care is not determined by their right to construct and maintain their lines, but rests upon their duty to protect others while in the lawful exercise of their rights. With the advance of civilization, electricity has become a necessity, and in order to make it useful to man it must be carried from place to place. The restrictions governing the handling of this commodity by public or private corporations or by individuals must, in view of its commercial and domestic importance, be reasonable, although the expense of what may be necessary to prevent injury to others is not an absolute defense to actions for injury for failure to take the necessary precautions.

"Apart from liability on the theory of the maintenance of a nuisance, an electric company which exercises the requisite degree of care, skill, and diligence discharges its entire obligation, and its liability ceases. No liability to respond in damages will attach in the absence of negligence on the part of the company or its employees proximately causing the injury complained of. The mere maintenance of high-tension transmission lines is not wrongful and, in order to hold the owner thereof negligent, where an injury occurs, he must be shown to have omitted some precaution which he should have taken."

Plaintiff's theory of liability on the part of KPL may be summarized as follows. The usage of metal irrigation pipes on Murphy Farm placed a duty on KPL: (1) to modify or relocate the lines in such a manner as would have prevented the accident in question; and/or (2) to place warning signs on the transmission poles.

Defendants KPL and Bob Wilson contend the mere usage of metal irrigation pipe in a rural cultivated field does not in and of itself mandate alteration of electrical transmission lines otherwise satisfactorily designed and maintained. Defendants argue that under the facts as adduced at trial there simply was no negligence shown, as a matter of law, in KPL's design, placement or operation of the line in question upon which liability could be predicated.

Plaintiff's expert witness on the KPL liability issue was Truett B. Thompson, a professor of electrical engineering at Arizona State University. Thompson's testimony is rather difficult to summarize by virtue of some problems with cohesion and lucidity. We believe it is, however, a fair statement to say Thompson had no real dissatisfaction with the design, location or operation of the power lines except for the presence of the irrigation pipes. Thompson testified the presence in the area of the metal irrigation pipe of sufficient length to reach the power line placed a duty on KPL to "mitigate this hazard."

As to precisely what action KPL could have taken, Thompson mentions three areas: (1) physical alteration of the lines to prevent

the accident; (2) placement of warning signs on the poles; and (3) regular inspection procedures. As to the first area, Thompson testified the safety of the installation could have been improved if KPL had raised, insulated, rerouted, or buried the power lines. As to the second area, Thompson testified, in his opinion, KPL should have placed warning signs on the transmission poles in the vicinity and on the wellhead. Thirdly, Thompson stated KPL had failed to develop a plan for systematic inspection of the lines as required by the National Electrical Safety Code and rules of the Kansas Corporation Commission.

Evidence was also introduced establishing that KPL was aware that there had been two prior instances in the state where injury had occurred by irrigation pipes contacting KPL power lines. Additionally a KPL training film was introduced which *inter alia* portrayed sticking an irrigation pipe into a power line as being a dangerous activity.

Does knowledge on the part of KPL that farm land adjacent to its power lines is being irrigated create a duty on the part of the power company to modify physically the lines in such manner as would absolutely prevent contact between an elevated irrigation pipe and an electrical current? We believe not.

KPL has 12,000 miles of comparable lines in rural Kansas, and said power company services only about one-third of the state. Obviously the total mileage of such lines in Kansas would be substantially greater. Transmission of electricity is a necessary fact of modern life. As noted in 26 Am. Jur. 2d, Electricity, Gas, and Steam § 39, p. 247, aforecited, the mere maintenance of high-tension transmission lines is not wrongful. For the power company to be liable for injury, it must be shown to have failed to take some precaution which it should have taken. KPL is not plaintiff's insurer. *Henderson,* 184 Kan. at 696.

Just as the transmission of electricity is a necessary fact of life in Kansas, so is the use of irrigation in farming. Owners of transmission lines operating in conformity with the National Electrical Safety Code are not under a duty to alter physically the lines by virtue solely of the owner of an adjacent cornfield shifting his operation from dry land farming to irrigated farming. Or put another way, the mere usage of metal irrigation pipe in a rural cultivated field does not, in and of itself, mandate alteration of existing electrical transmission lines otherwise satisfactorily

designed and maintained. To hold that usage of irrigation pipe alone creates a duty on a power company to raise, bury, relocate or coat its lines would place an unreasonable and unrealistic burden on power companies. This obviously could not be complied with and would, in essence, elevate the power company to the status of an insurer. This has not been and is not now the law of Kansas. There was simply no evidence that a prudent power company would have physically altered the lines under the circumstances herein.

Plaintiff's second area of alleged breach of duty by KPL is the failure to place warning signs on the poles and wellhead. Normally, whether or not there was a duty of the power company to place warning signs under the particular circumstances involved is a question for the trier of fact to determine. In this case, however, there is no evidence whatsoever that the presence of any warning signs would have prevented the accident. Even if placed on every pole and the wellhead, the signs could only have conveyed what both brothers already knew—that the plainly visible power lines located on the boundary line carried high voltage, and were dangerous if contacted. Under the circumstances herein, failure to post warning signs does not, as a matter of law, constitute negligence on the part of KPL. See *Berry v. Atlantic Coast Line Railroad Company*, 273 F.2d 572 (4th Cir.) *cert. denied* 362 U.S. 976 (1960).

As for the third area of alleged negligence, failure to maintain regular inspection, there was no defect in the line whose discovery and remedy would have prevented the accident. There is certainly no contention the prescribed duty to inspect encompasses stationing a 24-hour guard on the site to restrain persons from sticking irrigation pipes into the power lines. Any failure of the duty to inspect was simply not a factor in the accident herein.

For convenience the applicable rules of law as stated in *Henderson v. Kansas Power & Light Co.*, 184 Kan. 691, are repeated:

"[A]s a general rule electric companies which erect and maintain such lines are under a duty to exercise the highest degree of care to protect the public from danger.

"[T]he degree of care required of distributors of electricity is the degree which would be used by prudent men engaged in the industry, under like conditions and commensurate with the dangers involved and the practical operation of the plant, to guard against contingencies which can be reasonably foreseen and anticipated, but such distributors are not liable for occurrences which cannot be reasonably

anticipated and are not insurers against accidents and injuries." 184 Kan. at 695-96.

After a careful review of the record, considering the evidence in the light most favorable to the plaintiff, we conclude the trial court erred in overruling the motion of defendant KPL for a directed verdict. The evidence failed to establish, as a matter of law, any negligence on the part of KPL on which liability could be predicated under the circumstances herein. The judgment against KPL must be reversed. In so concluding we are not altering the existing law of Kansas relative to liability of transmitters of electricity—we are merely applying the existing law.

Numerous other issues are raised by KPL in its appeal. By virtue of the result heretofore reached, said issues are moot. The sole issue in the cross-appeal is whether the trial court erred in excluding economic loss from the jury's consideration in determining plaintiff's damages. The result reached on the appeal of KPL renders the cross-appeal moot as to KPL, but not as to defendant Bob Wilson. Accordingly, the only viable issues before us at this point are those between the brothers, Max and Bob Wilson.

Bob Wilson appeals from the judgment against him and asserts numerous points of error. The sole issue on the cross-appeal is, as previously stated, the economic loss damage issue. We do not reach these issues by virtue of a rather unique circumstance. The jury compared the fault of the three parties and concluded KPL was 60% at fault while each of the brothers was 20% at fault. KPL has now been held not to have been at fault. This leaves only the fault of the two brothers to be compared—each of whom has already been determined by jury trial to have been equally at fault. A determination of equal fault is certainly wholly consistent with the undisputed facts—the two brothers, acting in concert, elevated the pipe into the power line. Under the totality of the circumstances herein, we conclude that each of the brothers is now legally held to have been 50% at fault. Under such circumstances, the judgment against defendant Bob Wilson must be reversed pursuant to K.S.A. 60-258a(*a*), sometimes referred to as the "50% rule." This conclusion renders all remaining issues of the appeal and cross-appeal moot.

The judgments herein are reversed and the case is remanded to

the trial court with directions to enter judgment in favor of each defendant.

PRAGER, J., dissenting: I respectfully dissent. By this decision, the majority have, in effect, denied to the plaintiff his right to trial by jury and have substituted their collective judgment for that of the jury who heard the evidence, observed the witnesses, and then decided the case. The law which is applicable to the duties of an electrical power company is well established in this state by our decisions in *Henderson v. Kansas Power & Light Co.,* 184 Kan. 691, 339 P.2d 702 (1959), and the many cases cited therein.

In my judgment, there was substantial competent evidence presented on behalf of the plaintiff which, when viewed in the light most favorable to the party prevailing below, was sufficient to support the verdict of the jury in favor of the plaintiff. On the issue of foreseeability, there was evidence which showed that the employees of Kansas Power and Light Company (KPL) knew that the Wilsons were irrigating the cornfield, that they traditionally stored irrigation pipes in the southwest corner of the field under the power lines, and that the pipe was there when KPL employees installed an electric line for the irrigation pump. One employee knew from his own experience in irrigation farming that irrigation pipes were nesting places for rabbits and other rodents and that it was common for farmers to raise irrigation pipes in the air to remove them. One KPL employee actually had thought about the Wilsons upending a piece of pipe into the electrical wires. The defendant's employees were aware that injury and death had previously been caused by irrigation pipes coming into contact with a KPL power line. Bryce W. Kresie knew of an *actual fatal contact* 18 years before involving a farmer in the same general area who was electrocuted while attempting to dislodge a rabbit from an irrigation pipe when the pipe made contact with one of the defendant's lines. The foreseeability of injury from contacts between irrigation pipe and power lines was clearly established by the fact that KPL, before plaintiff's injury, had a film in its own library depicting exactly the type of occurrence as that which caused plaintiff's injury in this case. How can it be said, as a matter of law, that plaintiff's injury was not foreseeable by defendant?

The evidence showed that KPL had no established program for periodic, systematic, or routine inspection of its distribution

lines. The evidence was undisputed that there were no warning signs posted in the area. A qualified expert witness of plaintiff testified, without equivocation, that he inspected the premises and was fully informed as to the safety practices of the company and the provisions of the National Electrical Safety Code. In his opinion, the defendant power company was in *violation* of certain provisions of the National Electrical Safety Code. It was his expert opinion that KPL should have taken steps to reduce the possibility of contact between elevated irrigation pipes and the electrical line either by raising the line or insulating it. It was his opinion that the code had been violated, in that the defendant power company had failed to make periodic inspections as required by the code and that the minimum requirements for clearance for power lines as specified by the Kansas Corporation Commission had not been complied with.

In the course of the majority opinion, it is stated as a matter of law that owners of transmission lines, operating in conformity with the National Electrical Safety Code, are not under any duty to alter physically the lines by virtue solely of the owner of an adjacent cornfield shifting his operation from dry land farming to irrigation farming. Or put in another way, the mere usage of metal irrigation pipe in a rural cultivated field does not, in and of itself, mandate alteration of existing electrical transmission lines otherwise satisfactorily designed and maintained. The opinion concludes that to hold that the usage of irrigation pipe alone creates a duty on a power company to raise, bury, relocate or coat its lines would place an unreasonable and unrealistic burden on power companies. The opinion then states categorically that there was simply no evidence that a prudent power company would have physically altered the lines under the circumstances herein. The opinion then concludes as a matter of law that warning devices or periodic inspections were not factors in the accident.

With these conclusions, adopted as a matter of law, I cannot agree. *Henderson* makes it clear that a power company not only has a duty to use the highest degree of care in the construction of its lines but also has such a duty in the *maintenance* of its lines. As the use of land changes and the power company gains knowledge of a change which causes the existing lines to become a hazard to the safety of persons who may foreseeably come upon the premises, then the power company has a *continuing obliga-*

*tion* to take steps to see that the hazard and danger of injury are reduced accordingly. Additional cost or expense of making an already installed electrical line safer is not a defense. As noted in *Henderson v. Kansas Power & Light Co.,* 184 Kan. at 700:

"[T]he impracticability of insulating wires carrying a high voltage, and the expense of doing so, will not excuse the failure of the defendant to insulate nor preclude the plaintiff from recovering damages for injury and loss (*Worley v. Kansas Electric Power Co.,* [138 Kan. 69, 75, 23 P.2d 494 (1933)]; *Logan v. Electric Co.,* [99 Kan. 381, 161 Pac. 659 (1916)])."

This was a difficult case which was well tried by able counsel representing all of the parties. A jury of Kansas citizens heard the evidence and brought in a verdict in favor of the plaintiff. This verdict was approved by the trial judge who denied defendant's motion for a directed verdict and for a new trial. This court has now weighed the evidence and substituted its judgment for that of the jury and the trial judge. This an appellate court has no right to do where reasonable minds could differ.

I, therefore, respectfully dissent.