**Charles GAST, Plaintiff–Appellee and Cross–Appellant,**

v.

**CITY OF FOUNTAIN, Defendant–Appellant and Cross–Appellee.**

No. 91CA1673.

Colorado Court of Appeals, Div. V.

July 1, 1993.

As Modified on Denial of Rehearing Aug. 5, 1993.*

Certiorari Granted (Petitioner and Cross–Petitioner) April 4, 1994.

---

* Rothenberg, J., would grant petition of defendant-appellant and cross-appellee.

Melat, Pressman, Ezell & Higbie, Alan Higbie, Colorado Springs, for plaintiff-appellee and cross-appellant.

Hall & Evans, Alan Epstein, Denver, for defendant-appellant and cross-appellee.

Opinion by Judge RULAND.

Defendant, City of Fountain, appeals from a judgment entered upon a jury verdict in favor of plaintiff, Charles Gast. Plaintiff cross-appeals from the trial court's order regarding prejudgment interest. We reverse and remand for a new trial.

Plaintiff, then 17 years of age, sustained severe injuries in August of 1985 when he tilted an aluminum irrigation pipe in order to dislodge a rabbit trapped inside, and the pipe came into contact with uninsulated electric transmission lines owned and maintained by defendant. Plaintiff filed suit against defendant claiming that its negligence was the cause of his injuries. Defendant answered, asserting that plaintiff's own negligence was the sole cause of the accident.

The record reflects that the 7200–volt electric transmission system in question was initially constructed in 1964 by a rural electric association. The system consists of four lines attached to poles. Three of the lines

carry electricity and a fourth does not. The system was acquired by defendant in either 1968 or 1969.

The lines cross a parcel acquired by plaintiff's father in 1976 and the lines carrying electricity are situate at an elevation of approximately 20 feet above the ground. Since before 1970, three acres of this parcel had been irrigated from time-to-time by the 30-foot pipes for agricultural purposes. When not in use, the pipes were stacked and stored directly beneath the transmission lines.

Employees of defendant made some inspections of the lines. However, records of the inspections were not maintained, and no regular schedule for inspections was adopted. Employees also made regular visits to the parcel to read the electric meter and, on one occasion, to repair a transformer. The pipes stored beneath the lines were in plain view from the location of the meter and the transformer and had been so since 1976.

Plaintiff claimed that defendant was negligent in failing to recognize and take steps to resolve the obvious hazard posed by the irrigation pipes stored beneath the lines. Specifically, plaintiff relied upon alleged violations of the National Electrical Safety Code relative to elevation of the lines. In the alternative, plaintiff asserted that the Code and the industry standards were violated by defendant's failure to adopt and promote a general safety campaign consisting of mailing information to its customers of the inherent dangers in contacting the lines with long objects and to observe the pipes and require the property owner to remove the pipes from under the lines.

At the close of trial, the jury entered a general verdict finding defendant 60% negligent and plaintiff 40% negligent.

I

Defendant first argues that the trial court erred in denying its motion for directed verdict because plaintiff did not establish a prima facie case of negligence under either of his theories. Defendant, in effect, requested a directed verdict on the grounds that plaintiff had established no duty by it to protect against the type of accident that caused his injuries and that the accident was not foreseeable. We agree with one of defendant's contentions.

■ The issue of whether defendant owed a legal duty to plaintiff under the facts here is a question of law as is the scope of any duty legally perceived to apply. *Bath Excavating & Construction Co. v. Wills*, 847 P.2d 1141 (Colo.1993).

■ Several factors are relevant in making this determination including the risk involved, the foreseeability and likelihood of injury as weighed against the social utility of defendant's conduct, the magnitude of the burden required to guard against the injury, and the consequence of placing the burden upon the defendant. *Greenberg v. Perkins*, 845 P.2d 530 (Colo.1993).

■ In evaluating the issue of foreseeability in the context of a legal duty, if different inferences may be drawn from the evidence presented, that issue must be resolved by the jury. *Sewell v. Public Service Co.*, 832 P.2d 994 (Colo.App.1991).

■ Other considerations may also be relevant in resolving the duty issue because the ultimate standard for assessing the actor's obligation is one of fairness. Specifically, the test is whether reasonable persons recognize and agree that a duty exists under the circumstances. *Taco Bell, Inc. v. Lannon*, 744 P.2d 43 (Colo.1987).

■ To the extent that the duty issue is resolved in plaintiff's favor, then, in reviewing the denial of defendant's motion for directed verdict, the evidence must be viewed in a light most favorable to the plaintiff as the non-moving party. *Palmer v. A.H. Robins Co.*, 684 P.2d 187 (Colo.1984). As a result, every reasonable inference that may legitimately be drawn from the evidence must be construed in plaintiff's favor. *Evans v. Webster*, 832 P.2d 951 (Colo.App.1991). Finally, a directed verdict on the issue of negligence is not proper if the facts, or the inferences that may be drawn therefrom, are controverted. *Hennigar v. Van Every*, 139 Colo. 144, 337 P.2d 7 (1959).

### A

■ We initially address the issue whether defendant had a duty to elevate the transmission lines in excess of the 20–foot elevation that existed on the date of the accident.

The jury was instructed that the applicable provisions of the 1961 National Electrical Safety Code "in effect as a law of the state of Colorado" required that:

> All electric supply and communication lines and equipment shall be of suitable design and construction for the service and conditions under which they are to be operated. . . .
>
> To promote safety to the general public and to employees not authorized to approach conductors and other current-carrying parts of electric supply lines, such parts shall be arranged so as to provide adequate clearance from the ground or other space generally accessible, or shall be provided with guards so as to isolate them effectively from accidental contact by such persons.

The jury was further instructed that a violation of the Code constituted negligence.

Two experts were called to testify by plaintiff and two experts were called to testify by defendants relative to the proper elevation for the lines under the Code. One of plaintiff's experts testified that because this was a rural agricultural area, defendant could expect loaded hay wagons as high as 20 feet with the result that the lines should have been elevated to 27.5 feet in order to be safe for this activity. This expert also testified that, because 30–foot spans of irrigation pipe were in use, the Code required that the lines should be elevated to a height of 37.5 feet.

Plaintiff's other expert opined that the elevation of the lines was not in conformance with the Code and that those lines transmitting electricity should have been at least 22 feet high. However, he was also of the view that raising the lines to that height in this case would not have avoided this accident.

Both of defendant's experts testified that the elevation of the lines did comply with the Code and that, therefore, there was no violation of any duty on defendant's part under the circumstances. One of the experts stated that a 30–foot irrigation pipe when raised to its full vertical height would come in contact with "almost every line section in the United States across rural and agricultural lands."

Given this state of the record, we are unable to conclude that the elevation issue should have been submitted to the jury. Notwithstanding the dispute among the experts as to the proper interpretation of the Code, we are unable to conclude that defendant had a legal duty to elevate the lines further because of the presence of the irrigation pipe.

While we find no Colorado cases that have addressed this specific issue, we are persuaded by the opinion in *Wilson v. Kansas Power & Light Co.*, 232 Kan. 506, 513–514, 657 P.2d 546, 552 (1983) on defendant's duty under these circumstances:

> [T]he mere usage of metal irrigation pipe in a rural cultivated field does not, in and of itself, mandate alteration of existing electrical transmission lines otherwise satisfactorily designed and maintained. To hold that usage of irrigation pipe alone creates a duty on the power company to raise, bury, relocate or coat its lines would place an unreasonable and unrealistic burden on power companies. This obviously could not be complied with and would, in essence, elevate the power company to the status of an insurer.

Plaintiff presented no evidence seeking to establish that costs to defendant to elevate lines in agricultural areas where irrigation pipes are in use could reasonably be accommodated. *See Icenogle v. Myers*, 167 Ill. App.3d 239, 118 Ill.Dec. 95, 521 N.E.2d 163 (1988). Conversely, viewing together the testimony of the various experts, we find it apparent that the time and cost for such an undertaking throughout the various rural areas would be unreasonable.

### B

We next address plaintiff's contention that defendant failed to recognize the hazard presented by storage of the irrigation pipe under the transmission lines and the asserted duty of defendant to take affirmative acts to inform the owner and require removal of the

pipes and specific warnings as to the dangers inherent in storing the pipes in that area.

The jury was instructed relative to the Code pertinent to this issue as follows:

All electrical supply and communication lines and equipment shall be installed and maintained so as to reduce hazards to life as far as practicable.

Lines and equipment shall be systematically inspected from time to time by the person responsible for the installation. . . .

The jury was also instructed:

One carrying on an inherently dangerous activity such as the distribution of electricity must exercise the highest possible degree of skill, care, caution, diligence and foresight with regard to that activity, *according to the best technical, mechanical and scientific knowledge and methods which are practical and available* at the time of the claimed conduct which caused the claimed injury. (emphasis supplied)

In support of this claim, plaintiff presented testimony from his experts and an employee of the City of Colorado Springs utility department who was responsible for mailing literature involving safety practices to consumers as well as presenting public education programs on behalf of the city's electrical utility. This employee testified that electrical accidents in general had been significantly reduced because of its safety campaign. Plaintiff's experts also testified that this type of campaign was currently used, needed, and effective.

Plaintiff also introduced evidence consisting of literature prepared by various utilities reflecting the danger of customers using long objects in the vicinity of transmission lines. One particular brochure is dedicated only to the use of irrigation pipes and depicts an irrigation pipe with a rabbit inside and demonstrates the danger of elevating the pipe. Further, one of plaintiff's experts testified that, by 1982 or 1983, the knowledge that contacts between power lines and conductive objects were the major cause of power line injuries was part of the industry literature.

In further support of this claim, plaintiff presented evidence that defendant's inspection program was deficient, that defendant's employees should have been aware of the danger imposed by the storage of pipe under the lines, that substantial literature existed in the industry relative to this type of danger, and that, according to both of plaintiff's experts, the defendant was obligated to warn the property owner of the known and obvious danger. Testimony was introduced that, if the warning was not heeded, a utility should cut off electricity to the parcel until the pipes were moved.

■ It is apparent that the magnitude of the burden to warn a property owner who is storing 30–foot irrigation pipe under defendant's power lines is minimal. Certainly, on the record before us, the question of foreseeability of injury was for the jury. *See Sewell v. Public Service Co. supra.* And, contrary to defendant's contention, we do not view *Wilson v. Kansas Power & Light Co., supra,* as either addressing or as dispositive on the duty issues under these circumstances.

■ Because of the dangerous nature of electrical transmission lines, defendant is held to the highest degree of care consistent with the conduct of its business. *See Federal Insurance Co. v. Public Service Co.,* 194 Colo. 107, 570 P.2d 239 (1977); *Telecky v. Yampa Valley Electric Ass'n,* 837 P.2d 253 (Colo.App.1992).

Even if we assume that the *Wilson* court was correct in its assessment of the utility of placing warning signs on poles to prevent accidents with irrigation pipe, the focus of plaintiff's evidence on this issue is the duty of defendant to recognize the obvious and known danger presented by the storage of irrigation pipes under the lines and the minimal time, effort, and cost to warn a property owner of the danger and to require action on the owner's part to minimize that danger.

The fact that defendant had experienced no similar accidents during its ownership of the lines is not dispositive. As noted, information readily available in the industry had indicated the obvious danger since 1982 or 1983.

Conversely, storage of the pipe in another area of the field not adjacent to the transmis-

sion lines would have prevented the accident in this particular case.

Thus, we conclude that the evidence·established a legal duty on defendant's part to warn the property owner of the danger posed by the pipes stored under the line and that the issue of negligence in this regard was properly submitted to the jury.

## II

■ Relying upon *Enright v. City of Colorado Springs,* 716 P.2d 148 (Colo.App.1985), defendant contends that a new trial is required because all of plaintiff's theories should not have been submitted to the jury. Plaintiff responds that *Enright* is distinguishable because in that case different and distinct theories of liability were alleged while, in this case, only different acts of negligence are asserted. We agree with defendant.

We recognize that *Enright* addresses a fact situation in which alternate theories of liability were presented to the jury, namely, negligence and products liability. Because the court was unable to determine upon which theory the jury verdict may have been based, a new trial was required. However, we conclude that the same reasoning applies when different acts of negligence are alleged and that such has been the rule applied whenever alternate bases for recovery are presented to the jury without the use of special interrogatories which identify the theory relied upon by the jury. *See Burt v. Beautiful Savior Lutheran Church,* 809 P.2d 1064 (Colo.App.1990) (failure to instruct on comparative negligence is not reversible error if special verdicts indicate that jury found for plaintiff on both negligence and trespass theories).

Thus, in *Denver & Rio Grande R.R. Co. v. Sipes,* 23 Colo. 226, 47 P. 287 (1896), the plaintiff had alleged that the railroad was negligent in two respects for the death of her husband. First, she contended that the railroad had failed to close a switch that ultimately caused a derailment. In the alternative, she alleged that the railroad had failed to provide a proper signal light to warn the train to stop.

The court concluded that the conductor's negligent failure to close the switch was not imputable to the railroad and that, therefore, this issue should not have been submitted to the jury. The court concluded that a new trial was required because it could not determine upon which act of negligence the jury relied in returning its verdict. *See also O'Brien v. Wallace,* 145 Colo. 291, 359 P.2d 1029 (1961).

Applying the rule here, because we are unable to determine whether the jury's verdict was based upon evidence that the lines should have been elevated, we remand the case for a new trial.

## III

We address one additional contention that may arise on retrial. Defendant argues that the trial court abused its discretion by allowing a neuropsychologist to testify about a medical diagnosis without first collaborating with a physician. We find no abuse of discretion.

■ Section 12–43–209, C.R.S. (1991 Repl.Vol. 5B) provides that a psychologist "in order to make provision for the diagnosis and treatment of medical problems, shall collaborate with a physician licensed under the laws of the state ... [and shall not] diagnose, prescribe for, treat, or advise a client with reference to medical problems." Because plaintiff's neuropsychologist did not collaborate with a physician before finding that plaintiff suffered from organic brain injury, defendant contends his testimony concerning the presence of this disorder was improper.

Contrary to defendant's contentions, the statute contains no *per se* prohibition of the testimony. Therefore, the issue is governed by CRE 702. Under this rule, the testimony was properly admitted if the neuropsychologist was qualified by reason of knowledge, skill, experience, training, or education to comment on the presence of organic brain injury and if his comments assisted the trier of fact.

■ The qualification of expert witnesses rests largely within the discretion of the trial court. *City of Pueblo v. Ratliff,* 137

Colo. 468, 327 P.2d 270 (1958). Further, trial courts possess very broad discretion to determine whether any proffered witness is qualified to give expert testimony. *People v. Giles*, 192 Colo. 240, 557 P.2d 408 (1976). Absent an abuse of that discretion, a trial court's ruling on the qualification of an expert will not be disturbed on appeal. *Baird v. Power Rental Equipment, Inc.*, 191 Colo. 319, 552 P.2d 494 (1976).

Here, plaintiff's neuropsychologist testified that he made a diagnosis of organic brain injury using the American Psychiatric Association's *Diagnostic & Statistical Manual* (3d ed. rev. 1987) and that psychologists are qualified to make such diagnoses. The witness had been asked by physicians, on prior occasions, to perform neuropsychological evaluations on patients in order to determine if a brain injury had occurred. He also testified that in his examination of plaintiff he relied on plaintiff's history, plaintiff's medical records, his observations of plaintiff, his interviews with plaintiff's family, and plaintiff's school records as well as neuropsychological testing, in forming his opinion.

The witness was familiar with plaintiff and with the methods used in practice to diagnose an organic brain injury, and we perceive no abuse of discretion in allowing the testimony. *See Stark v. Poudre School District R-1*, 192 Colo. 396, 560 P.2d 77 (1977).

The judgment is reversed, and the cause is remanded for a new trial. Because the issues of liability and damages were bifurcated and tried separately in the trial court, the new trial shall be limited to the issue of liability only.

DAVIDSON, J., concurs.

ROTHENBERG, J., concurs in part and dissents in part.

Judge ROTHENBERG concurring in part and dissenting in part.

I agree with that portion of the majority opinion which concludes that the City of Fountain had no duty to elevate the transmission lines. However, because I also conclude that plaintiff failed to prove the breach of *any* duty owed to him and also failed to establish that any alleged negligence by the City of Fountain proximately caused his accident, I respectfully dissent from that portion of the majority opinion which remands the cause for a new trial.

In *Connes v. Molalla Transport System, Inc.*, 831 P.2d 1316, 1320 (Colo.1992), our supreme court discussed duty in the context of a negligence claim:

A duty of reasonable care arises when there is a foreseeable risk of injury to others from a defendant's failure to take protective action to prevent the injury. While foreseeability is a prime factor in the duty calculus, a court also must weigh other factors, including the social utility of the defendant's conduct, the magnitude of the burden of guarding against the harm caused to the plaintiff, the practical consequences of placing such a burden on the defendant, and any additional elements disclosed by the particular circumstances of the case. (citations omitted)

Thus, our supreme court recognized that no one factor was controlling. Instead, the question of whether a duty existed was based upon fairness, that is, "whether reasonable persons would recognize a duty and agree that it exists." *Taco Bell, Inc. v. Lannon*, 744 P.2d 43, 46 (Colo.1987).

In *Wilson v. Kansas Power & Light Co.*, 232 Kan. 506, 657 P.2d 546 (1983) the Kansas supreme court faced a factual situation virtually identical to the instant case. There, the plaintiff was injured while laying aluminum irrigation pipe on a farm he owned with his brothers. The plaintiff and one of his brothers were in the process of moving a 30–foot section of irrigation pipe when they noticed that the gate inside the pipe was loose. They lifted the pipe vertically in order to allow the gate to fall out of the irrigation pipe, and the pipe came into contact with the overhead high-voltage power line owned and maintained by the defendant power company.

The injured plaintiff filed an action against the power company claiming that the use of metal irrigation pipes on his property created a duty by the power company to: (1) modify or relocate the power lines in such a manner as would have prevented the accident in

question; (2) place warning signs on the transmission poles; and/or (3) regularly inspect the poles.

Following a jury verdict finding the power company primarily at fault, the Kansas supreme court reversed and ordered judgment entered in favor of the power company. The court rejected all of the plaintiff's theories of liability and held that he either did not establish a duty owed to him or that the power company's alleged negligence did not proximately cause plaintiff's injuries.

The *Wilson* court also rejected plaintiff's claim that the power company was negligent in failing to put warning signs on the poles, finding that there was no evidence that the presence of warning signs would have prevented the accident. It found that, even if signs had been placed on the poles, the warnings would only have told plaintiff and his brother what they already knew: that high voltage power lines are dangerous if touched with a metal pipe.

There is a substantial body of authority consistent with the holding in *Wilson. See First Trust & Savings Bank v. Commonwealth Edison Co.,* 141 Ill.App.3d 668, 95 Ill.Dec. 782, 490 N.E.2d 255 (1986) (power company did not have duty to guard against possibility that citizens band radio towers might make contact with power lines on private property); *Mosby v. Southwestern Electric Power Co.,* 659 F.2d 680 (5th Cir.1981) ("a claim of ignorance of the properties and dangers of electricity is not worthy of credence in this day and age."). *See also Plunkett v. Arkansas Power & Light Co.,* 282 Ark. 252, 668 S.W.2d 8 (1984) (it is common knowledge that electric wires are dangerous and to be avoided); *Daniel v. South Kentucky R.E.C.C.,* 609 S.W.2d 372 (Ky.App. 1980) (testimony that plaintiff did not know the voltage of overhead wires or whether the wires were insulated was irrelevant; plaintiff charged with knowledge of danger of power lines as a matter of law).

Here, at the time of the accident, plaintiff was 17 years old. According to the testimony, this regrettable accident occurred simply because he was not paying attention to the electric wires when he lifted the irrigation pipe. He nowhere suggests that he was unaware of the dangers of electricity, nor does he cite to any authority in which a court has imposed a duty upon a power company to warn of the dangers of electricity under similar circumstances.

In the absence of any such authority, I would hold that when, as here, there is no showing that the high voltage power lines violated code requirements or that the defendant had reason to anticipate a specific danger, the mere possibility that someone might lift a 30-foot irrigation pipe vertically and accidentally contact a power line is insufficient as a matter of law to establish any duty by the deliverer of electricity to warn or to take other precautions.

I would further hold that although a safety program warning about the dangers of electricity might be highly desirable, here, the failure to warn plaintiff of the danger of electricity was not a proximate cause of the accident as a matter of law because it is common knowledge that electric wires are dangerous. *See Wilson v. Kansas Power & Light Co. supra; Mosby v. Southwestern Electric Power Co. supra; Plunkett v. Arkansas Power & Light Co. supra.*

I would therefore reverse the judgment of the trial court and remand with directions that judgment be entered in favor of the City of Fountain.