**CITY OF FOUNTAIN, Petitioner/Cross–Respondent,**

v.

**Charles GAST, Respondent/Cross–Petitioner.**

**NO. 93SC534.**

Supreme Court of Colorado,
En Banc.

Oct. 2, 1995.

As Modified on Denial of Rehearing
Nov. 6, 1995.

Hall & Evans, L.L.C., Alan Epstein, Denver, William F. Eggert, Denver, for Petitioner/Cross–Respondent.

Melat, Pressman, Ezell & Higbie, Glenn Pressman, Alan Higbie, Robert J. Frank, Colorado Springs, for Respondent/Cross–Petitioner.

Justice MULLARKEY delivered the Opinion of the Court.

We granted certiorari to consider a case brought against the City of Fountain (Fountain) by Charles Gast who was injured when an irrigation pipe he was holding came in contact with an overhead electric transmission line owned and operated by Fountain. *Gast v. City of Fountain,* 870 P.2d 506 (Colo. App.1993). The issues before us are whether Fountain, in its capacity as an electric utility, owed Gast a duty to warn of the danger posed by storing irrigation pipe under a transmission line, and whether the court of appeals erred in holding that the statutory duty to take reasonable measures to protect persons on the ground excluded raising power lines to a safe height.

On an appeal by Fountain, the court of appeals reversed the jury verdict entered in favor of Gast and remanded the case for a new trial. The court found that Gast asserted Fountain was negligent in two respects: Fountain's failure to elevate the height of the transmission line and its failure to warn customers of the dangers of contacting transmission lines with irrigation pipe. *Id.* at 508. The court addressed these questions of duty as matters of law and concluded that Fountain had a duty to warn but did not have a duty to elevate the height of its transmission line. *Id.* at 508–11.

We reject the court of appeals' analysis. The trial court did not find the two duties of care articulated by the court of appeals. Rather, the trial court provided the jury with instructions based upon: (1) the highest degree of care to protect the public from the dangers of electricity, *see Yampa Valley Elec. Ass'n, Inc. v. Telecky,* 862 P.2d 252, 254 (Colo.1993) (describing the standard of care applicable to an electric utility as " 'the highest degree of care which skill and foresight can attain consistent with the practical conduct of its business under the known methods and the present state of the particular art.' ") (quoting *Denver Consol. Elec. Co. v. Simpson,* 21 Colo. 371, 376–77, 41 P. 499, 501 (1895)), and (2) compliance with the standards articulated under the National Electrical Safety Code (NESC). Neither a duty to warn nor a duty to elevate line height was imposed on Fountain by the trial court.

Thus, we conclude that the court of appeals erred in setting aside the jury verdict. We reverse and remand the case for further proceedings consistent with this opinion.

I.

Gast, who was then 17 years old, sustained serious burns and neurological injuries in a 1985 accident which occurred when he tilted a 30–foot aluminum irrigation pipe in order to dislodge a rabbit trapped inside. While he was looking down, the pipe came into contact with uninsulated overhead electric transmission lines owned and maintained by Fountain. The resulting electrical shock caused Gast's injuries. Gast filed suit against Fountain claiming that its negligence was the cause of his injuries. Fountain answered, asserting that Gast's own negligence was the sole cause of the accident.

The 7200–volt electric transmission system in question was initially constructed in 1964 by a rural electric association and purchased by Fountain in 1968 or 1969. The system consists of four uninsulated lines strung between two poles at a height of approximately 20 feet. The two poles were 326.3 feet apart, and only one pole was on the Gast property. The lines did not cross the Gast property but rather terminated there. A transformer on the Gast property reduced the voltage to 240

or 480 volts for operation of an irrigation pump and also provided 220 volt service to the family home by way of an underground line.

Gast's father acquired the property in 1976. Since sometime before 1970, three acres of the parcel have been irrigated occasionally by using 30–foot lengths of aluminum irrigation pipe. When not in use, the pipe is stacked and stored on the property.

Gast claimed that Fountain was negligent in failing to recognize and take steps to resolve the hazard posed by the use and storage of irrigation pipe near the electrical lines. Specifically, Gast alleged that Fountain violated certain portions of the NESC in its maintenance of the electrical lines and failed to meet its duty of highest care as an electric utility.

The jury entered a general verdict finding Fountain to be 60% negligent and Gast to be 40% negligent. The court of appeals reversed and remanded the case for a new trial. It held that Fountain had no duty to elevate the electrical lines but did have a duty to warn the property owner of the danger posed by storing pipe under the electrical lines.

## II.

■■■ Electric power companies which erect and maintain power lines are under a duty to exercise the highest degree of care to protect the public from the dangers of electricity. *Federal Ins. Co. v. Public Serv. Co.*, 194 Colo. 107, 112, 570 P.2d 239, 242 (1977). However, power companies are not liable for occurrences which cannot be reasonably anticipated and are not insurers against all accidents and injuries. *Henderson v. Kansas Power & Light Co.*, 184 Kan. 691, 339 P.2d 702, 706 (1959).

■■■ The NESC guidelines outline minimum standards for the industry and can be used as evidence of a utility's compliance with applicable industry standards. *Yampa Valley*, 862 P.2d at 257.[1] Compliance with NESC standards does not conclusively establish that the highest degree of care was exercised but is merely one circumstance to be considered in determining the highest degree of skill and care. *Id.; Blueflame Gas, Inc. v. Van Hoose*, 679 P.2d 579, 591 (Colo. 1984).

The relevant jury instructions given in this case provided:[2]

12. An electrical utility company transmitting electricity through overhead wires is not required to protect against any and all possible eventualities. Such a requirement would make the utility company an insurer.

The term "insurer" means one who guarantees safety to any one.

13. You are instructed that an electric utility is presumed to possess special knowledge and skill in electricity which it must utilize for protection of its patrons, and that in determining whether the utility has exercised reasonable care and caution the jury must be aware that the required level of care increases as the danger increases.

14. One carrying on an inherently dangerous activity such as the distribution [of electricity] must exercise the highest possible degree of skill, care, caution, diligence and foresight with regard to that activity, according to the best technical, mechanical, and scientific knowledge and methods which are practical and available at the time of the claimed conduct which caused the claimed injury. The failure to do so is negligence.

.     .     .     .     .

---

1. The allegations in *Yampa Valley* were very similar to the present case. In *Yampa Valley,* the plaintiff alleged in her complaint that Yampa Valley negligently failed to: (1) warn the victim of the dangers of the power line; (2) bury the power line below ground; (3) insulate the power line; (4) provide adequate clearance around the power line; (5) reduce the voltage in the power line before running it across the Telecky proper-

ty; and (6) place the uninsulated wire at a greater distance from the residence. *Yampa Valley,* 862 P.2d at 254. All of the allegations were provided as examples of the failure of Yampa Valley to exercise the highest degree of care.

2. The jury instructions have not been challenged on appeal.

21. The negligence of the defendant, City of Fountain, is not a cause of any injuries to the plaintiff, Charles Gast, unless injury to a person in the plaintiff's situation was a reasonably foreseeable consequence of that negligence. The exact or precise injury need not have been foreseeable, but it is sufficient if the defendant, with the highest duty of care, under the same or similar circumstances, would have anticipated that injury to a person in the plaintiff's situation might result from the defendant's conduct.

.     .     .     .     .

26. At the time of the occurrence in question in this case, the following National Electrical Safety Code provisions were in effect as the law of the State of Colorado:

§ 210—All electric supply and communication lines and equipment shall be of suitable design and construction for the service and conditions under which they are to be operated.

§ 211—All electric supply and communication lines and equipment shall be installed and maintained so as to reduce hazards to life as far as practicable.

§ 213(A)(2)—Lines and equipment shall be systematically inspected from time to time by the person responsible for the installation.

§ 230(E)—The clearances required by this section shall be maintained at the specified values.

§ 214(A)—To promote safety to the general public and to employees not authorized to approach conductors and other current-carrying parts of electric supply lines, such parts shall be arranged so as to provide adequate clearance from the ground or other space generally accessible, or shall be provided with guards so as to isolate them effectively from accidental contact by such persons.

A violation of any of these sections of the National Electrical Safety Code constitutes negligence.

If you find such a violation, you may only consider it if you find that it was the cause of the claimed injuries.[3]

■ These jury instructions properly explained Fountain's duty of care as established by our case law. Initially, the jury was cautioned that Fountain was not an insurer and could not guarantee a customer's safety under any and all circumstances. As an electric utility, Fountain was correctly held to the highest duty of care consistent with the industry's best available knowledge and technology. Various sections of the NESC were cited to the jury as setting forth the minimum standards which Fountain must meet to satisfy its duty of care. Causation instructions were given in both the NESC instruction (number 26) and in a separate instruction (number 21). Because the jury returned a general verdict of negligence against Fountain, we cannot determine whether the jury found that Fountain had violated the minimum standards set forth in the NESC or whether the jury found that Fountain satisfied the NESC standards but nevertheless failed to meet the highest duty of care imposed on it under instruction 14.

■ The jury was *not* instructed, however, on the two duties of care of which Fountain complained on appeal to the court of appeals. Gast did not request such instructions, and no trial court ruling imposed such duties of care. As the court of appeals correctly acknowledged in its opinion, *Gast,* 870 P.2d at 508, and Fountain agrees in its briefs, defining the duty of care is a question of law for the trial court to determine. Given the lack of any instruction or trial court ruling, this case does not present the duty of care issues decided by the court of appeals in its *Gast* opinion.[4] Rather, the jury was prop-

3. All citations to the NESC refer to the 1961 version of the code. The NESC has since been rescinded by the Colorado Public Utilities Commission.

4. The only relevant issue which Fountain preserved for appeal was an evidentiary question which it raised in a motion *in limine* and again in its motion for a new trial. In a pre-trial

motion *in limine,* Fountain attempted to exclude Gast from presenting any testimony by either expert or lay witnesses that Fountain should have raised the line height or educated customers about the dangers of overhead transmission lines. The motion was denied in a minute order. In its motion for a new trial, Fountain again challenged the trial court's denial of its *in limine*

erly instructed and allowed to make a determination of what is reasonable in a particular factual setting. *Ekberg v. Greene,* 196 Colo. 494, 497, 588 P.2d 375, 377 (1978). It is the sole province of the jury to resolve disputed issues of fact and to determine credibility of witnesses, weight to be accorded testimony, and inferences to be drawn from evidence. *Vigil v. Pine,* 176 Colo. 384, 388, 490 P.2d 934, 936 (1971). Thus, we conclude that the court of appeals erred when it reversed the jury verdict. There was no trial court error in defining Fountain's duty of care.

To understand how this case was tried, we will review briefly the plaintiff's theories and the evidence presented. As we noted in footnote 1 of this opinion, Gast's theories were similar to those asserted in *Yampa Valley,* 862 P.2d at 254. Like the plaintiff in *Yampa Valley,* Gast presented evidence of a variety of actions which he claimed Fountain could have taken to avoid the accident. Gast contended that Fountain's failure to take any one of several precautions supported a finding of negligence on behalf of the electric utility.

■ At several points in the trial, including its motions for directed verdicts, Fountain argued that Gast was pursuing his negligence claims under specific duties to warn and to raise the line height. Gast repeatedly denied Fountain's claims and insisted that he was asserting a general negligence claim.[5] The court denied Fountain's motions for a directed verdict at the close of the plaintiff's case and at the close of all of the evidence. Throughout the trial, the court treated the case as a general negligence claim and regularly sustained Fountain's objections if a plaintiff's witness made any reference to

Fountain having a "duty" to warn or to raise the line height.

Both Gast and Fountain presented extensive evidence from experts concerning adequate line clearance and hazard recognition and mitigation under the NESC. Generally, the testimony involved discussion of proper line height, hazard recognition and mitigation efforts of various electric providers, and public awareness programs. All of the testimony was used to support or negate general negligence, rather than specific duties.

Testimony was presented on line height. Gast and Fountain both called experts to determine the proper elevation for lines under the NESC. One of Gast's experts testified that, according to the general practice, the lines should have been at a height of 27.5 feet rather than 20 feet, assuming normal conditions. However, the expert also testified that because 30–foot lengths of irrigation pipe were in use, NESC required a clearance of 37.5 feet. Gast's other expert opined that the elevation was not in conformance with the NESC and that the lines carrying electricity should have been at least 22 feet high. The expert noted, however, that even at such a height, the accident would not have been avoided. Fountain's experts testified that the lines' elevations complied with the NESC's minimum clearance requirements. Thus, a factual dispute existed among the experts concerning the appropriate line height.

Sufficient evidence was presented to establish that Fountain should have recognized the hazard presented by the irrigation pipe. All of the experts presented opinions concerning the various circumstances that put Fountain

---

motion but did not contest the jury instructions defining Fountain's duty of care.

5. There is one instance, however, when Gast's counsel, addressing Fountain's motion for a directed verdict at the close of Gast's case, orally mentioned specific duties of care:

They [Fountain] have a series of duties, there is testimony from qualified engineers, duty to know, duty to investigation [sic], duty to warn, hazard recognition code violations. It goes on and on and on.

The arguments of counsel, of course, are not evidence. *See Rego Co. v. McKown–Katy,* 801 P.2d 536, 540 (Colo.1990) (noting that it is stan-

dard to instruct the jury that "arguments of counsel are not evidence"). The statement in question was not made before the jury and was not adopted by the court in any way. Given the attempts generally made throughout the trial to carefully limit references to "duty," this remark in oral argument is best understood as a poor choice of words used by counsel to refer to Gast's "laundry list" of theories. We reach this conclusion because the statement was followed immediately by another statement by Gast's counsel emphasizing that "[o]ur claim is simple negligence...."

on constructive notice of hazards and risks. According to Gast's experts, Fountain had actual notice of the risk posed by irrigation pipe because electrical workers had visited the property and had seen the irrigation pipe near the overhanging electrical wires. Fountain also had constructive notice, according to the experts, based on the availability of industry literature and seminars discussing the risks of irrigation pipe coming into contact with electrical lines. Furthermore, the plaintiff's experts opined that, as part of a continuing obligation to recognize hazards under the NESC, Fountain had a continuing obligation to inspect the electrical poles and surrounding areas in order to evaluate environmental changes and to assess new risks to property owners or occupants. Fountain provided little evidence of hazard recognition programs which it had in place.

In addition to the hazard recognition efforts, Gast presented extensive testimony concerning hazard mitigation within the electrical industry. The evidence revealed that, although Gast may have been exposed at school to public education programs concerning the dangers of electricity, no efforts were made by Fountain to educate the public or to mitigate the hazard presented by the electrical wires on the Gast property. When asked whether the industry standard required utilities to gather, know and disseminate information about the dangers of electricity, one expert testified that dissemination of such information to consumers should be "part of an overall program." In the expert's opinion, Fountain did not engage in good engineering and industry practice because it did not conduct adequate consumer education programs.[6] In addition to public education programs, the expert testified that guards should be placed around electrical wires if the nature of the use of land under the wires changed since the installation of the wires. Another expert testified that effective mitigation would require Fountain to ask the landowner to move the pipes, to elevate line height, to bury the line, to build a fence

around the line (which, according to the expert, did not seem feasible in the present situation), or to warn the landowner of the hazard. The expert testified that, if the landowner failed to act, the utility was under a duty to de-energize, or shut down, the lines until the landowner agreed to solve the safety hazard. Fountain presented little evidence contesting the need for a hazard mitigation program. Fountain also provided virtually no evidence of hazard mitigation efforts.

The jury was instructed to evaluate the credibility of the experts and other witnesses, and it decided what weight to give the varying testimony. In its deliberations, the jury decided whether the actions of Fountain were sufficient to satisfy the highest degree of care and the NESC. The jury found negligence on the part of both Fountain and Gast and apportioned responsibility, finding that Fountain was 60% negligent for the accident under the general guidelines of the jury instructions. No special verdict forms were requested or used.

As our summary of the evidence shows, the jury could have adopted any one of several theories presented by Gast's experts. Additionally, the experts' testimony focused on which practices were consistent with good engineering and industry practice. The court of appeals' decision, and Fountain's arguments before us, assume that the jury necessarily found that Fountain failed to raise the line and to warn Gast of the dangers posed by an overhead transmission line. It is equally possible that the jury found Fountain negligent because it failed to bury the line or to take other hazard recognition and mitigation steps identified by Gast's experts. Any of these findings could support the jury's conclusion that Fountain's practices fell below the duty of highest care and the standards in the NESC because they were not consistent with good engineering and industry practice.

6. Gast presented evidence from the City of Colorado Springs as an example of public awareness and education programs which are effectively used as part of an overall safety program. Colorado Springs also is a municipality providing electrical services. It engages in extensive television advertising and has a program concerning electricity which it sends to various schools as part of its program.

Because the jury was properly instructed concerning the duty of care for electric utilities, its verdict should not have been overturned on appeal. Accordingly, we reverse the judgment of the court of appeals and remand this case for further proceedings consistent with this opinion.

ERICKSON, J., dissents.

VOLLACK, C.J., and KOURLIS, J., join in the dissent.

Justice ERICKSON dissenting:

I respectfully dissent.

The negligence claims at issue in this case are the result of a tragic accident that caused Charles Gast, a seventeen-year old, to suffer severe personal injuries. Gast was working around the yard of his father's farmhouse. A number of sections of irrigation pipe were stored on the Gast farm under electric power lines. The Gast dogs chased a rabbit into one of the irrigation pipes. Gast attempted to dislodge and trap the rabbit. He raised the thirty-foot, three-inch aluminum irrigation pipe into a vertical position and came in contact with a power line.

The court of appeals reversed the judgment entered on a jury verdict for Gast and remanded for a new trial. *Gast v. City of Fountain*, 870 P.2d 506 (Colo.App.1993). A majority of this court has concluded that there was evidence to support the jury verdict. The majority's remand directs that the court of appeals reinstate the jury verdict and review those issues raised on appeal that were not addressed because of the court of appeals reversal and remand to the district court for a new trial on the liability issue.

In the district court, Gast claimed that the City of Fountain (Fountain) was negligent and asserted that Fountain negligently installed, operated, inspected, and maintained the electric power lines. The primary claims were that Fountain was negligent in not elevating the power lines and in not carrying out its duty to warn of the dangers of storing aluminum irrigation pipe under high voltage power lines. In a motion *in limine*, Fountain sought an order prohibiting Gast from presenting any testimony by lay or expert witnesses that Fountain was under a duty to elevate the power lines or warn Gast of the dangers inherent in overhead electric power lines. The motion was denied. Fountain also moved for a directed verdict at the end of Gast's case in chief and at the close of all the evidence on the grounds that (1) Gast failed to establish that Fountain had any duty to Gast to provide protection against the type of accident that caused Gast's injuries; and (2) Gast failed to establish that Fountain proximately caused Gast's injuries.[1] The district court denied Fountain's motion.

The district court rejected Fountain's proposed jury instruction limiting Fountain's obligations to Gast.[2] Fountain also objected to certain jury instructions on causation, foreseeability, and the appropriate standard of care. The instructions given to the jury quoted section 214(A) of the National Electrical Safety Code that provided that "electric supply lines shall be arranged so as to provide adequate clearance from the ground. . . ." From this instruction, Gast argued that Fountain had a duty to elevate the power lines. While the jury was instructed that Fountain must exercise the highest possible degree of care, no specific instruction on duty to warn was given. The jury entered a general verdict finding Fountain 60% negligent and Gast 40% negligent. Fountain then filed a motion for judgment notwithstanding the verdict and a motion for a new trial asserting that the evidence presented failed to establish that Fountain owed Gast

1. The majority states that Gast repeatedly denied Fountain's assertion that Gast's negligence claims were based on Fountain's duty to elevate the power lines and duty to warn because Gast alleged a general negligence claim. Maj. op. at 482. However, in response to Fountain's motion for a directed verdict, Gast stated, "They [Fountain] have a series of duties, there is testimony from qualified engineers, duty to know, duty to investigation [sic], *duty to warn*, hazard recognition code violations." (Emphasis added.).

2. One of Fountain's proposed jury instruction provided that "the mere presence of irrigation pipes on land in a rural area does not require a public utility to take any special actions to safeguard the public therefrom." The instruction was refused.

any legal duty or that Fountain proximately caused Gast's injuries.

The issue of whether Fountain owed Gast a duty to elevate the power lines or a duty to warn was preserved for review by virtue of the following: (1) Fountain's motion *in limine;* (2) Fountain's motion for a directed verdict at the close of Gast's case and at the close of all the evidence; (3) the district court's failure to submit Fountain's proposed instruction that it had neither a duty to warn nor a duty to elevate and Fountain's objection to the instructions given; and (4) Fountain's motion for judgment notwithstanding the verdict and its motion for a new trial.

The court of appeals concluded that the instructions given to the jury required a new trial because a duty to elevate could be inferred from the instructions and from Gast's argument as to negligence. All members of the court of appeals concluded that the statutory duty to take reasonable measures to protect persons on the ground excluded raising power lines to a safe height. The court of appeals said:

> We initially address the issue whether defendant had a duty to elevate the transmission lines in excess of the 20–foot elevation that existed on the date of the accident.
>
> The jury was instructed that the applicable provisions of the 1961 National Electrical Safety Code "in effect as a law of the state of Colorado" required that:
>
>> All electric supply and communication lines and equipment shall be of suitable design and construction for the service and conditions under which they are to be operated....
>>
>> To promote safety to the general public and to employees not authorized to approach conductors and other current-carrying parts of electric supply lines, such parts shall be arranged so as to provide adequate clearance from the ground or other space generally accessible, or shall be provided with guards so as to isolate them effectively from accidental contact by such persons.
>
> The jury was further instructed that a violation of the Code constituted negligence.

Two experts were called to testify by plaintiff and two experts were called to testify by defendants relative to the proper elevation for the lines under the Code. One of plaintiff's experts testified that because this was a rural agricultural area, defendant could expect loaded hay wagons as high as 20 feet with the result that the lines should have been elevated to 27.5 feet in order to be safe for this activity. This expert also testified that, because 30–foot spans of irrigation pipe were in use, the Code required that the lines should be elevated to a height of 37.5 feet.

Plaintiff's other expert opined that the elevation of the lines was not in conformance with the Code and that those lines transmitting electricity should have been at least 22 feet high. However, he was also of the view that raising the lines to that height in this case would not have avoided this accident.

Both of defendant's experts testified that the elevation of the lines did comply with the Code and that, therefore, there was no violation of any duty on defendant's part under the circumstances. One of the experts stated that a 30–foot irrigation pipe when raised to its full vertical height would come in contact with "almost every line section in the United States across rural and agricultural lands."

Given this state of the record, we are unable to conclude that the elevation issue should have been submitted to the jury. Notwithstanding the dispute among the experts as to the proper interpretation of the Code, we are unable to conclude that defendant had a legal duty to elevate the lines further because of the presence of the irrigation pipe.

*Gast,* 870 P.2d at 509. The court of appeals relied on *Wilson v. Kansas Power & Light Co.,* 232 Kan. 506, 657 P.2d 546, 552 (1983), which states that:

> [T]he mere usage of metal irrigation pipe in a rural cultivated field does not, in and of itself, mandate alteration of existing electrical transmission lines otherwise satisfactorily designed and maintained. To hold that usage of irrigation pipe alone

creates a duty on the power company to raise, bury, relocate or coat its lines would place an unreasonable and unrealistic burden on power companies. This obviously could not be complied with and would, in essence, elevate the power company to the status of insurer.

Two members of the court of appeals panel concluded that Fountain had a legal duty to warn Gast of the dangers posed by the power lines. *Gast,* 870 P.2d at 511. The court of appeals ordered a new trial because of the likelihood that the jury's verdict was founded upon the imposition of a duty on Fountain to elevate the power lines. *Id.* In dissent, Judge Rothenberg, who agreed that Fountain had no duty to elevate the power lines, stated that Fountain did not owe Gast a duty to warn of the danger posed by storing irrigation pipe under a transmission line. *Id.* at 512. Judge Rothenberg concluded that the record contained no evidence of negligence by Fountain to support the jury's verdict for Gast and would have reversed the trial court with directions to enter judgment for Fountain. *Id.* at 513. I agree with Judge Rothenberg's dissent.

The court of appeals properly addressed whether Fountain owed Gast a duty to elevate or a duty to warn, and from the record I conclude that there was no evidence of negligence to support the jury's verdict against Fountain and in favor of Gast. Accordingly, I would reverse and return this case to the court of appeals with directions for remand to the district court to enter judgment for Fountain.

I am authorized to say that Chief Justice VOLLACK and Justice KOURLIS join in this dissent.

